43 A.3d 415

**Marjorie Gayle HENDRIX**

v.

**Charles Robert BURNS, et ux.**

No. 2039, Sept. Term, 2010.

Court of Special Appeals of Maryland.

March 29, 2012.

Reconsideration Denied June 7, 2012.

2

4

**6**

Clay M. Barnes, Towson, MD, for Appellant.

Harold L. Burgin (Stoner, Preston & Boswell Chartered, on the brief), Towson, MD, for Appellee.

Panel: DEBORAH S. EYLER, MEREDITH and WOODWARD, JJ.

DEBORAH S. EYLER, J.

Marjorie Gayle Hendrix, the appellant, was injured in an automobile accident caused by Charles Robert Burns, one of the appellees. In the Circuit Court for Baltimore County, Mrs. Hendrix sued Mr. Burns and Candice Marie Burns, his wife, the other appellee, alleging battery and negligence against Mr. Burns and negligent entrustment against Mrs. Burns. Mrs. Hendrix prayed a jury trial. Before trial, the court granted summary judgment on the battery claim and Mr. and Mrs. Burns admitted liability on the negligence claims against them. The trial court granted motions *in limine* that precluded Mrs. Hendrix from introducing certain evidence and making certain information known to the jury, as we shall discuss below; it also granted a motion to strike an amendment to the complaint.

The case was tried to the jury solely on damages, for four days. The jurors returned a verdict in favor of Mrs. Hendrix for $85,000. Unhappy with the outcome, Mrs. Hendrix noted

an appeal, posing four questions for review, which we have combined and reworded as follows:

I. Did the circuit court err in granting summary judgment on the battery claim?

II. Did the circuit court err or abuse its discretion by granting motions *in limine* that precluded the admission of certain evidence?

III. Did the circuit court abuse its discretion by granting Mrs. Burns's motion to strike Mrs. Hendrix's amendment to the complaint? [1]

We shall affirm the circuit court's judgment.

## FACTS AND PROCEEDINGS

The automobile accident that gave rise to this lawsuit took place on July 25, 2005, at approximately 5:30 p.m., at the

---

**1.** The questions as framed by Mrs. Hendrix are:

 1. Did the lower court err in granting summary judgment in favor of the Defendant/Appellee, Charles Robert Burns, on Appellant's claim of battery by automobile, where the record established that this Appellee was engaged in a high-speed "road rage" pursuit of another motorist on a heavily traveled thoroughfare, accelerated through a red traffic signal while chasing that motorist and then collided with Plaintiff/Appellant's vehicle as she lawfully proceeded through an intersection on a green light?

 2. Did the total blackout imposed by the lower court at trial regarding both the assertion of, and the factual basis for, Appellant's claim for negligent entrustment against Appellee, Candice Marie Burns, violate Appellant's right to a fair, open and public jury trial and also operate to confuse and/or mislead the jury by preventing it from knowing the nature of and the factual basis for Appellant's cause of action against Ms. Burns?

 3. Where the evidence of Appellees' pre- and post-crash conduct was relevant and material to the cause, the nature and extent of Appellant's claim for "noneconomic" damages for mental anguish and emotional distress ("psychic injury") resulting from her awareness that conduct, and given the nature of Appellant's career employment, did the lower court err, abuse its discretion and violate Appellant's right to a fair trial when granting the Appellees' Motion *in limine* to totally exclude all of the evidence at trial that formed the basis for that claim?

 4. Where Appellant amended her Complaint against Appellee, Candice Marie Burns, more than thirty days prior to trial, in order to plead additional factual information that had been developed incident

intersection of Belair Road and Glen Park Road, which at its western terminus is the entry to a shopping center. The intersection is controlled by a traffic light.

Mr. Burns was driving south on Belair Road, in a Jeep Cherokee. The traffic light at Glen Park Road was red in his direction, and at least one car was stopped at the light. Mr. Burns failed to stop for the red light and drove through the intersection. At the same time, Mrs. Hendrix was driving her Toyota Corolla through the intersection, in an easterly direction on Glen Park Road, having just exited the shopping center. The light was green in her favor when she entered the intersection, and remained so as she traveled through it. In the intersection, Mr. Burns's Jeep struck the rear driver's side of Mrs. Hendrix's Toyota, causing the Toyota to spin around at least once and almost hit another vehicle head-on. In the collision, Mrs. Hendrix sustained injuries to her neck, shoulders, chest, and abdomen and suffered emotional injuries, including thinking she would not survive.

The Jeep Mr. Burns was driving was owned by Mrs. Burns. She allowed her husband to use it, with her knowledge and permission, on a regular basis.

Mr. Burns had a history of substance abuse, a criminal record, and a record of driving violations. On the day of the accident, he had consumed alcohol. After the collision, he initially tried to leave the scene in his damaged Jeep, but did not get far, and walked back to the accident location. He was taken into custody and charged with reckless driving, driving while under the influence of alcohol, driving while impaired by alcohol, and related offenses. On November 1, 2005, also in the Circuit Court for Baltimore County, Mr. Burns was tried on an agreed statement of facts and was found guilty of driving while under the influence of alcohol and reckless driving. The State *nolle prossed* the remaining charges. Mr.

to pre-trial discovery proceedings, did the lower court err and abuse its discretion in granting Appellee's motion to strike Appellant's Amendment to her Complaint that alleged that additional information?

Burns was sentenced to 18 months in prison, all but three
months suspended, one year probation, a $250 fine for driving
while under the influence of alcohol, and a $100 fine for
reckless driving. On December 15, 2005, Mr. Burns's sen-
tence for driving while under the influence of alcohol was
reduced to 16 days in prison with 18 months probation and a
$250 fine.

On October 22, 2007, Mrs. Hendrix filed suit in the case at
bar. As noted, before trial, the court granted summary
judgment in favor of Mr. Burns on the battery claim; thereaf-
ter, and also before trial, Mr. Burns and Mrs. Burns each
conceded liability for the claims against them (negligence
against Mr. Burns and negligent entrustment against Mrs.
Burns), leaving damages as the sole issue for decision by a
jury.[2] With knowledge that the Burnses each were conceding
liability, the trial court granted motions *in limine* that pre-
cluded Mrs. Hendrix from introducing evidence that, in the
time leading up to the accident, Mr. Burns had been drunk;
had been involved in a "road rage" incident with another
driver and was pursuing that driver when he ran the red light
at the intersection; had attempted to flee after the accident;
and had a criminal record that included DUI convictions. In a
related decision, the trial court ruled that the jury could not
be informed in opening statement (or in any other way) of the
precise nature of the negligent entrustment claim for which
Mrs. Burns had conceded liability, nor could Mrs. Hendrix
introduce evidence of the facts underlying the negligent en-
trustment claim, *i.e.*, the events in Mr. Burns's past that were
known to his wife and gave rise to a duty on her part not to
entrust the Jeep to him.

On August 26, 2010, Mrs. Hendrix filed an amended com-
plaint, changing the negligent entrustment count to add alle-

---

2. In a deposition on April 22, 2009, Mr. Burns had conceded, through
counsel, "that [he] was the negligent cause of this accident" and had
waived the affirmative defenses of contributory negligence and assump-
tion of the risk. By letter of October 26, 2009, Mrs. Burns had
conceded, through counsel, liability for negligent entrustment.

gations of intentional misconduct on the part of Mrs. Burns. Mrs. Burns filed a motion to strike the amendments.

The trial took place beginning September 29, 2010. At the outset, the court granted Mrs. Burns's motion to strike the portion of the complaint that had been amended. After jury selection, and before opening statements, the court gave introductory instructions to the jury, including that Mr. and Mrs. Burns had conceded liability. In that regard, the court told the jurors:

> Members of the panel, I wanted to also instruct you at the beginning here that this matter is before you with respect to damages for personal injuries sustained by [Mrs. Hendrix], and that the defendants [Mr. and Mrs. Burns] . . . have essentially stipulated to liability in this case so this is not an issue that you need to decide as to the accident and who caused the accident. It's a question as to the damages alleged to be sustained by [Mrs. Hendrix] and what amount that would be, you know, with respect to that.

Mrs. Hendrix called Captain Jason Hahn of the Baltimore County Fire Department, who testified that he was the first emergency responder on the scene of the accident and called for a rescue team to extract Mrs. Hendrix from her damaged car. Gary Lay, an Emergency Medical Technician ("EMT"), testified that he arrived five minutes after the accident had happened. By then, Mrs. Hendrix had been removed from her vehicle. She was complaining of pain in her left shoulder, left flank, back, head, chest, left abdominal region, and neck. She had a half-inch laceration on her head. She was conscious and alert. EMT Lay examined Mrs. Hendrix, immobilized her neck, and transported her to The Johns Hopkins Bayview Medical Center.

Steven Hendrix, Mrs. Hendrix's husband, testified that when he arrived at the scene of the accident his wife already was in the ambulance and was complaining of "excruciating" pain. They went to the hospital and returned home early the next morning. They had to ask family members to come and help take care of Mrs. Hendrix. At the time of trial, Mrs.

Hendrix still was experiencing neck pain. On cross-examination, Mr. Hendrix acknowledged that his wife's bruises went away after several months, and that she recently had traveled to Ireland for two weeks.

Officer Ronald Leard of the Baltimore County Police Department also was called by Mrs. Hendrix. He testified that he was assigned to investigate the accident. He was not able to determine the speed of either vehicle prior to the impact.

Mrs. Hendrix called two independent eyewitnesses. The first, Harry Monios, testified that he was driving a truck next to Mrs. Hendrix's vehicle at the time of the accident and saw the Jeep "fly" through the intersection. The Jeep hit Mr. Monios's truck and then "slammed into [Mrs. Hendrix's] car" and "spun it around." The second eyewitness, Ryan Cannon, testified that he also saw the accident happen. He saw the Jeep drive through the red light on Belair Road. He estimated that it was traveling at about 30 miles per hour.

Mrs. Hendrix called Mr. Burns as an adverse witness. Mr. Burns testified that he remembered traveling through the intersection and that right before the crash he was driving at 45 miles per hour, which was the speed limit for that segment of Belair Road. Before he reached the intersection, he saw the traffic light turn yellow and attempted to slow down. He did not see any vehicles in the intersection until the time of impact.

Mrs. Hendrix's neighbor, Tracey Myers, a nurse, testified that she helped Mrs. Hendrix care for herself at home for several weeks after the accident. Nurse Myers observed extensive bruises that were "almost black" on Mrs. Hendrix's chest, breasts, belly, and sides in the days after the accident. She described Mrs. Hendrix as "a very caring and vibrant woman" who became "very despondent and very depressed that she could not do for herself and could not do for others as she has normally done."

At the time of the accident, Mrs. Hendrix was employed at the Baltimore County 911 call center. Her friend and co-worker, Amy Siedlecki, testified that, after the accident, Mrs.

Hendrix was unable to enjoy hobbies such as working in her garden, photography, or even reading a book. Another friend and co-worker from the 911 call center, Carol Redding, testified that Mrs. Hendrix was unable to work for two months after the accident. Ms. Redding called Mrs. Hendrix twice during that two month period, but Mrs. Hendrix was unable to come to the phone the first time and could speak for less than a minute the second time because it hurt too much to hold the phone to her ear. Ms. Redding observed that Mrs. Hendrix still had severe bruises when she returned to work, and had much less enthusiasm for her work than before the accident. Mrs. Hendrix's daughter, Stephanie Staats, testified that her mother had been very involved in caring for Staats's daughter after she was born in April 2005, but after the accident she was unable to hold the baby or otherwise help.

Mrs. Hendrix also called Nathan Rosenblum, M.D., a board certified internist, who had been her treating physician since 1993 and had continued to treat her after the accident. Dr. Rosenblum testified about Mrs. Hendrix's health before the accident and the progression and treatment of her injuries after the accident. Dr. Rosenblum's testimony consumes 125 pages of the trial transcript.

Mrs. Hendrix testified on her own behalf. She described the events surrounding the accident. Immediately before the collision, she was in her Toyota Corolla facing east at the traffic light at the exit of the shopping center, perpendicular to Belair Road. The light was red, and then turned green. She hesitated after the light turned green and then proceeded through the intersection. She did not see the Jeep coming. She heard "boom boom" and her car started spinning toward another car. She slammed on her brakes and her car stopped just short of hitting the other car.

Mrs. Hendrix further testified that, after the accident, she had trouble doing her job. She had worked at the 911 call center for 26 years as an operator, a position that involves sitting at a desk and typing data into a computer for long hours. On September 9, 2009, she retired. She testified that

she could no longer garden or redecorate or even clean her house as much as she could before the accident. She had hoped that upon retirement she would develop a second career as a photographer, but she could not do so because the injuries she sustained in the accident made her unable to carry a camera around her neck. Her relationship with her granddaughter had been interrupted because of her injuries. On cross-examination, Mrs. Hendrix acknowledged traveling to Ireland for 10 days in 2009, taking two cruises, spending a long weekend in Ocean City, and taking a trip to Las Vegas with her daughter in March 2010.

Over the course of the trial, Mrs. Hendrix moved into evidence photographs of her family, the accident scene, the damage to her car, and the bruises on her abdomen, chest, and neck.

Mr. and Mrs. Burns did not present any evidence.

As noted, the trial lasted four days. After deliberations, the jury returned a verdict in favor of Mrs. Hendrix and against Mr. and Mrs. Burns for $85,000. Not satisfied with that award of damages, Mrs. Hendrix noted a timely appeal from the judgment entered on the verdict.

We shall add pertinent facts as relevant to our discussion of the issues.

## DISCUSSION

### I.

#### Summary Judgment On The Battery Claim

As mentioned above, one of Mrs. Hendrix's claims against Mr. Burns was for battery. At the close of discovery, Mr. Burns filed a motion for summary judgment on that claim and requested a hearing. He argued that the facts most favorable to Mrs. Hendrix on the summary judgment record were legally insufficient to prove that he had intentionally struck her, which, he asserted, is an essential element of the tort of battery. He complained that, given that the defendants had

conceded liability for negligence, the battery claim was being used as a means to introduce evidence on "the issue of alcohol and other alleged outrageous conduct," in an attempt to recover punitive damages.

Mrs. Hendrix filed an opposition to the motion, arguing that the issue of Mr. Burns's intent was a factual question that "plainly [was] in dispute," and should be decided by a jury on the basis of credibility. In support of her opposition, Mrs. Hendrix submitted affidavits by eyewitnesses Ryan Cannon and Harry Monios. She asserted that the affidavits showed that Mr. Burns had been engaged in "road rage" behavior immediately before the accident, which conduct was sufficient to prove intent and therefore establish liability for battery. She also argued that, even if that evidence was not sufficient to show an intent on Mr. Burns's part to harm her, it was sufficient to show an intent on his part to harm the person with whom he was engaged in the "road rage" incident and, under the doctrine of transferred intent, that would be sufficient intent to support a civil battery claim.

In the affidavit by Ryan Cannon, he attested that he was driving south on Belair Road along the same route as Mr. Burns and at the same time. He first noticed Mr. Burns's Jeep at the intersection of Belair and Mountain Roads, which is about six miles north of the collision site. Mr. Burns was driving erratically, with his Jeep weaving between lanes of traffic in tight spots between other vehicles. Just south of Reckord Road, Mr. Burns began "tailgating" a Toyota Camry, at one point speeding around it and then slamming on his brakes, coming almost to a complete stop in front of it. The Camry just missed hitting the back of the Jeep. A few minutes later, Mr. Cannon witnessed Mr. Burns repeat the exact same actions toward the Camry. All the vehicles on that side of Belair Road continued to drive south. Mr. Burns's Jeep passed Mr. Cannon's vehicle at Sunshine Avenue. At that point, Mr. Burns was driving between 80 and 90 miles per hour. Mr. Cannon wrote down the Jeep's license plate number and called 911.

Mr. Cannon continued driving south on Belair Road and then observed Mr. Burns's Jeep in a southbound left turn lane at Forge Road, behind the Camry. Mr. Cannon saw Mr. Burns get out of the Jeep, walk over to the driver's side window of the Camry, and give the Camry driver an angry look. The Camry driver quickly maneuvered his car out of the left turn lane and back onto southbound Belair Road, passing Mr. Cannon's vehicle. This took place not far north of the location of the collision.

As Mr. Cannon approached the intersection of Belair Road and Glen Park Road, he saw the Camry, ahead of him, drive through the intersection. The light turned red and Mr. Cannon stopped his car. He then looked in his rear view mirror and saw Mr. Burns's Jeep "approaching my vehicle . . . at a high rate of speed attempting to catch up with the Toyota Camry that had already driven through the intersection." Mr. Cannon saw a compact blue vehicle (which turned out to be Mrs. Hendrix's car) driving east on Glen Park Road, at about 5 to 10 miles per hour, having just left the shopping center. He then saw Mr. Burns drive his Jeep through the red light at the intersection, at a high rate of speed.[3] The front of the Jeep hit the left rear of the compact car. Mr. Burns made no attempt to stop the Jeep before running the red light. After the accident, Mr. Burns got out of the Jeep briefly, got back in, and then tried to drive off, but the Jeep would not move. He then returned on foot to the site of the collision.

In his affidavit, Harry Monios attested that, just before the collision, he was stopped in his vehicle—a truck with a large trailer attached—at the shopping center exit. He was facing east, perpendicular to Belair Road, and the light was red in his direction. A small Toyota (Mrs. Hendrix's car), which he

---

**3.** There is nothing in the record to explain why, in his affidavit, Mr. Cannon attested that Mr. Burns drove through the intersection at a high rate of speed, but at trial he testified that Mr. Burns drove through the intersection at 30 miles per hour. The discrepancy does not matter for purposes of our deciding whether the court erred in granting summary judgment on the battery claim, as we confine our review of that issue to the summary judgment record.

described as silver, also was waiting at the red light, in the lane to his right. The light turned green, and he started to drive into the intersection. Mrs. Hendrix entered the intersection before he did. At that point, the Jeep drove through the red light on Belair Road, grazing Mr. Monios's truck and hitting Mrs. Hendrix's car. When the Jeep entered the intersection, the light had been red for drivers on Belair Road for "at least four or five seconds." Mr. Burns made no effort to stop for the red light. After the collision, Mr. Burns tried to flee the scene, without success.

The court granted Mr. Burns's motion for summary judgment on the battery claim in a written ruling, stating, in relevant part:

> Affidavits filed in Opposition to the Motion for Summary Judgment show, in addition to negligence, that Charles Robert Burns may have had an ongoing dispute (road range [sic]) with a Camry automobile over a 6 mile distance as he and the Camry were traveling South on Belair Road.... According to the Plaintiff, this creates a jury question as to whether there was an intentional act against the Plaintiff in this case, who was not involved in the 6 mile South episode and who was hit by Burns as she crossed perpendicular to Burns at an intersection where Burns admits he did not stop as he should have to avoid the collision with the Plaintiff.
>
> Based on the argument, transcripts, and affidavits presented, I do not see sufficient facts to allow the Plaintiff to withstand summary judgment. **Opposition facts show no intent against the Plaintiff so as to constitute a battery and no facts to support any theory of transferred intent that would constitute a battery.**

(Emphasis added.)

Later, Mrs. Hendrix filed a motion for reconsideration, and another judge overruled that ruling, determining that summary judgment should not have been granted on the battery claim. Finally, yet a third judge reconsidered the motion for summary judgment, and reinstated the original ruling grant-

ing summary judgment in favor of Mr. Burns on the battery claim. That ruling stood.

We review *de novo* a circuit court's decision to grant a motion for summary judgment. *Poole v. Coakley & Williams Constr., Inc.*, 423 Md. 91, 108–09, 31 A.3d 212 (2011) (quoting *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98 (2004)). Essentially, we engage in the same two-part legal decision-making in which the circuit court engages when it is making its decision under Rule 2–501. *See Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 113–14, 843 A.2d 865 (2004). We determine first whether there is any genuine dispute of material fact. *Appiah v. Hall*, 416 Md. 533, 546, 7 A.3d 536 (2010). A material fact is one the decision about which will affect the outcome of the claim. *Debbas v. Nelson*, 389 Md. 364, 373, 885 A.2d 802 (2005) (quoting *Todd v. Mass Transit Admin.*, 373 Md. 149, 155, 816 A.2d 930 (2003)). If there is a genuine dispute of material fact, summary judgment is not proper, and, on review, we shall reverse the decision to grant it. *See, e.g., Thompson v. Balt. Cnty.*, 169 Md.App. 241, 900 A.2d 275 (2006) (reversing grant of summary judgment because of genuine dispute of material fact). If there is no genuine dispute of material fact, we then consider whether, on the undisputed material facts, the moving party is entitled to judgment on the claim as a matter of law. *See 120 W. Fayette St., LLLP v. Mayor and City Council of Balt. City*, 413 Md. 309, 328–29, 992 A.2d 459 (2010); *Hill v. Knapp*, 396 Md. 700, 711, 914 A.2d 1193 (2007); *O'Connor v. Balt. Cnty.*, 382 Md. 102, 110–11, 854 A.2d 1191 (2004). If the answer to that question is yes, we shall affirm the grant of summary judgment. *See, e.g., Piscatelli v. Smith*, 424 Md. 294, 35 A.3d 1140 (2012) (affirming grant of summary judgment where opposing party failed to adduce facts that would demonstrate a genuine dispute of material fact and moving party was entitled to judgment as a matter of law).

On appeal, Mrs. Hendrix argues that the facts in the summary judgment record taken most favorably to her battery claim did not entitle Mr. Burns to judgment as a matter

of law. She maintains that the court erred in ruling that the tort of battery requires a showing of what she calls "specific intent" by the tortfeasor to cause harm to the plaintiff. She also argues that, to the extent that proof of intent to harm the plaintiff is required, there was evidence that Mr. Burns intended to harm the driver of the Camry, and that a jury could transfer that intent to harm to her, under the doctrine of transferred intent.

Mr. Burns counters that the affidavits submitted by Mrs. Hendrix were conclusory and therefore would not constitute admissible evidence at trial, including the so-called evidence of intent. Alternatively, Mr. Burns argues that, even if the facts in the affidavits of Mr. Cannon and Mr. Monios were admissible in evidence, they were legally insufficient to show that he intended to cause a harmful or offensive contact with Mrs. Hendrix, which is the necessary intent element of the tort of battery; and that intent to cause a harmful or offensive contact cannot be proven even by conduct that is reckless or wanton. He further argues that, in Maryland, the doctrine of transferred intent only has been applied in criminal cases, and not to the tort of battery; and that, even if that doctrine were to apply, there was no evidence in the summary judgment record of an intent on his part to cause a harmful or offensive contact with the driver of the Camry, so there was no evidence of a legally sufficient intent that could be transferred to Mrs. Hendrix. Finally, Mr. Burns asserts that, if there was error on the part of the circuit court in granting summary judgment on the battery count, the error was not prejudicial, because Mrs. Hendrix could not have adduced evidence at trial to support a punitive damages award, and therefore would have recovered the same amount of damages she recovered anyway on her negligence claims.

 "A battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll,* 355 Md. 593, 600, 735 A.2d 1096 (1999) (citing RESTATEMENT (SECOND) OF TORTS § 13 (1965)). *See also Saba v. Darling,* 320 Md. 45, 49, 575 A.2d 1240 (1990) (stating

that "[a] battery has been defined as a harmful or offensive contact with a person resulting from an act intended to cause the person such contact"). "A battery may occur through a defendant's direct or indirect contact with the plaintiff." *Nelson*, 355 Md. at 600, 735 A.2d 1096. Thus, one can commit a battery by hitting another person with one's fists or by putting an instrumentality in motion—for example, a bullet fired from a gun—that hits the person.

 "It is universally understood that some form of intent is required for battery. . . . It is also clear, however, that the intent required is not a specific intent to cause the type of harm that occurred." *Nelson*, 355 Md. at 601–02, 735 A.2d 1096 (footnote omitted). The *Nelson* Court further explained:

> The intent element of battery requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact.

*Id.* at 602–03, 735 A.2d 1096. *See also* MPJI–Cv 15:2 (stating, in part, that "battery is the intentional touching of a person without that person's consent"). In addition, lesser states of mind—such as recklessness or wantonness—do not equate to the intent to cause a harmful or offensive contact. "Reckless, wanton or willful misconduct differs from intentional wrongdoing." *Johnson v. Mountaire Farms of Delmarva, Inc.*, 305 Md. 246, 253, 503 A.2d 708 (1986). In *Saba* and *Johnson*, the Court quoted with approval comment f to section 500 of the RESTATEMENT (SECOND) OF TORTS, which provides:

> *Intentional misconduct and recklessness contrasted.* Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove

harmless. However a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.

In *Nelson,* the most recent Maryland appellate case about the tort of battery, the defendant shot the plaintiff in a nightclub during an argument over a debt. The plaintiff's version of events was that the defendant demanded repayment in full of the debt and when the plaintiff gave him less than what was owed, the defendant pulled out a gun and shot him. The defendant's version of events, put on through the testimony of a witness, was that, during the argument, he pulled out a gun, hit the plaintiff on the side of the head with it, and the gun accidentally discharged, resulting in the plaintiff's being shot and suffering serious injuries.

The Court of Appeals held that, on the facts most favorable to the defendant, *i.e.,* that the shooting was an accident, the trial court should have granted judgment in favor of the plaintiff on liability for battery, allowing the jury to decide damages only. The Court reasoned that when the defendant brandished the gun and then hit the plaintiff on the side of the head with it, he committed an assault and then a battery, and that, even though the ultimate injury that resulted was brought about by the gun going off and the bullet striking the plaintiff, the defendant was liable for battery and for the harm to the plaintiff that resulted from the battery, although the harm was more extensive than the defendant had intended it to be. The Court concluded:

> The law imposes on [the defendant] the responsibility for losses associated with his wrongful actions. It is of no import that he may not have intended to actually shoot [the plaintiff] **since the uncontested facts demonstrate that he did intend to invade [the plaintiff's] legally protected interests in not being physically harmed or assaulted.** He violated those interests by committing an assault and battery when he threatened [the plaintiff] with the handgun and struck [the plaintiff] on the head. Even assuming as we must that [the defendant] did not intend to inflict the particular damages arising from the gunshot wound, it is

more appropriate that those losses fall to [the defendant] as the wrongdoer than to [the plaintiff] as the innocent victim. *Nelson*, 355 Md. at 609, 735 A.2d 1096 (emphasis added).

In *Saba*, the plaintiff and the defendant were among a group of men out for the night drinking at bars. At one point, the defendant, who was known to become violent when drunk, punched the plaintiff in the face, breaking his jaw. The plaintiff sued the defendant for battery and negligence, but, upon learning that the defendant's insurance, which was his only asset, did not cover intentional acts, voluntarily dismissed the battery claim and proceeded only on his negligence claim. The trial court allowed the negligence claim to go to the jury, which found the plaintiff guilty of contributory negligence, thus returning a defense verdict.

The plaintiff appealed, arguing that the defense of contributory negligence should not have been submitted to the jury. This Court affirmed the verdict on the ground that the negligence claim should not have been submitted to the jury, as the defendant's conduct constituted the tort of battery, not negligence. *Saba v. Darling,* 72 Md.App. 487, 531 A.2d 696 (1987). The Court of Appeals granted *certiorari* and agreed, holding that, even if the defendant intended to punch the plaintiff in the face but not to actually break his jaw by doing so, the defendant's conduct constituted a battery, not negligence.

In the case at bar, the facts in the summary judgment record, viewed most favorably to Mrs. Hendrix, are at the opposite spectrum of events as those in *Nelson* and *Saba.* To be sure, a battery can be committed by the use of an automobile, just as it can be committed by the use of a gun or other instrumentality. A person can use an automobile or other vehicle to intentionally hit another person. Here, however, there was no evidence in the summary judgment record to show that Mr. Burns drove through the intersection with the intention of hitting Mrs. Hendrix's vehicle (and hence Mrs. Hendrix) with his Jeep. His conduct in running the red light at a high rate of speed certainly could be characterized as

reckless. But, as the cases discussed above and in section 500 of the RESTATEMENT (SECOND) OF TORTS make clear, reckless, wanton, or willful conduct is not equivalent to intentional conduct. As there was no evidence in the summary judgment record that Mr. Burns intended to strike Mrs. Hendrix's vehicle with his own vehicle, the evidence was legally insufficient to generate a jury question on the battery claim.

As noted, Mrs. Hendrix argues, in the alternative, that even if the evidence in the summary judgment record did not create a jury question on the issue whether Mr. Burns had the requisite intent to cause a harmful or offensive conduct with her, the intent element of the tort of battery could be proven by application of the doctrine of transferred intent. Specifically, Mrs. Hendrix asserts that Mr. Burns's intent to cause a harmful or offensive contact with the driver of the Camry, with whom he was involved in the ongoing "road rage" episode, could be transferred to her, thereby satisfying the intent element of her battery claim.

Transferred intent is a common law doctrine applied primarily in the criminal law arena. See Harvey v. State, 111 Md.App. 401, 681 A.2d 628, cert. denied, 344 Md. 330, 686 A.2d 635 (1996) (discussing the common law origins of the doctrine of transferred intent and its application to modern Maryland cases); see also Gladden v. State, 273 Md. 383, 330 A.2d 176 (1974) (recognizing, in a case of first impression, that the common law doctrine of transferred intent applies in Maryland law with regard to crime of murder).

In a seminal law review article written in 1967, Professor Prosser suggested that the transferred intent doctrine applies not only to certain crimes but also to certain intentional torts, namely those that derive from the ancient common law action of trespass: battery, assault, false imprisonment, trespass to chattels, and trespass to land. William L. Prosser, Transferred Intent, 45 TEX. L.REV. 650, 654–58 (1967). In the article, Professor Prosser gives a hypothetical example of a defendant who shoots a gun, intending to kill A, but accidentally—due to poor aim—kills B; and suggests that the defen-

dant would be liable to B for civil battery because "[t]he intention follows the bullet." *Id.* at 650. Likewise, the RESTATEMENT (SECOND) OF TORTS states, with regard to the tort of battery, "[i]f an act is done with the intention of affecting a third person ..., but causes a harmful bodily contact to another, the actor is liable to such other as fully as though he intended so to affect him." § 16(2). *See also* 6 Am.Jur.2d *Assault & Battery* § 94 (2008) (*"Transferred intent.* The tort of assault or battery may be committed, even though the person struck is not the one the defendant intended to attack.") (citing cases); 1 Harper James & Gray on Torts § 3.3 at 318 (3d ed. 2006) ("Indeed, it is not even necessary that the defendant intend to invade the *plaintiff's* interest if the battery on someone else was intended. Thus, by the fiction of 'transferred intent,' a defendant who intends to strike a third person is liable if the blow miscarries and strikes the plaintiff.") (citing cases).

Several of our sister states have applied the doctrine of transferred intent to intentional torts. *See, e.g., Baska v. Scherzer,* 283 Kan. 750, 156 P.3d 617 (2007) (applying transferred intent doctrine to assault and battery torts when plaintiff was injured when she stepped between two sparring defendants); *Hall v. McBryde,* 919 P.2d 910 (Colo.App.1996) (holding that, as a matter of law, when defendant aimed and fired loaded weapon at passing car, but mistakenly hit bystander, proof of intent for tort of battery could be shown by transferring intent to hurt occupants of car to bystander); *Holloway v. Wachovia Bank & Trust Co., N.A.,* 109 N.C.App. 403, 428 S.E.2d 453 (1993) (concluding, in case of first impression, that transferred intent doctrine applied to a civil assault claim when defendant bank agent brandished firearm at people in car, including plaintiff, during attempt to repossess car, but did not point firearm directly at plaintiff), *aff'd in part and rev'd in part on other grounds,* 339 N.C. 338, 452 S.E.2d 233 (1994); *Keel v. Hainline,* 331 P.2d 397 (Okla.1958) (applying transferred intent doctrine to assault and battery tort claims in which child was injured when sitting in classroom between two groups of students who were throwing erasers at

each other); *Morrow v. Flores,* 225 S.W.2d 621 (Tex.Civ.App. 1949) (applying transferred intent doctrine to civil assault and battery claims when defendant intended to shoot fleeing vandal but missed and shot plaintiff instead).

In Maryland, there is no reported case in which the doctrine of transferred intent has been applied to the tort of battery, or any intentional tort. The Maryland Civil Pattern Jury Instructions take the doctrine into account, however, stating, for the tort of battery, "[t]he touching need not be directed at the plaintiff; it is sufficient if the touching is directed at another person and as a consequence the plaintiff is touched." MPJI–Cv § 15:3. The comment to that instruction states that the doctrine "may be used in a battery case when the defendant intended to touch a third person and instead touched the plaintiff." Cmt. A.2.

 We hold that the doctrine of transferred intent may be applied in a civil claim for battery on legally sufficient facts. In the case at bar, however, application of the doctrine of transferred intent does not save Mrs. Hendrix from the grant of summary judgment in Mr. Burns's favor on the battery claim. Mrs. Hendrix seeks to transfer to herself Mr. Burns's intent to cause harmful or offensive contact with the driver of the Camry. Although Mr. Cannon's affidavit attests to facts that show that Mr. Burns exhibited anger toward the Camry driver for no discernible reason, and that his conduct could be described in the vernacular as "road rage," the facts, viewed most favorably to Mrs. Hendrix, do not show an intent on the part of Mr. Burns to cause harmful or offensive contact with the Camry driver. Mr. Burns's actions toward the driver of the Camry consisted of driving his (Mr. Burns's) Jeep in front of the Camry and then almost coming to a stop, so that the Camry driver had to apply his brakes suddenly to keep from hitting the Jeep; getting out of the Jeep and walking angrily to the driver's window of the Camry; and speeding through the red light in an effort to catch up to the Camry after it had eluded him. Notwithstanding the evidence that Mr. Burns was enraged at the Camry driver for some un-

known or irrational reason,[4] there was no evidence to suggest that Mr. Burns intended to inflict harm on the Camry driver. Without legally sufficient evidence of an intent by Mr. Burns to cause a harmful or offensive contact with the Camry driver, which then could be transferred, the doctrine of transferred intent is of no avail to Mrs. Hendrix in her battery claim.

Accordingly, the circuit court correctly granted summary judgment in favor of Mr. Burns on the battery count.

## II.

### *Motion in Limine Rulings*

As noted above, before trial, motions *in limine* were granted that precluded Mrs. Hendrix from introducing evidence that Mr. Burns was drunk when the collision happened, was engaged in a "road rage" incident with another driver, and then tried to flee, and that Mr. Burns had prior criminal convictions for drunk driving. In addition, on the morning of trial, the court ruled that the jury could not be informed, by opening statement or in some other way, of the precise nature of the negligence for which Mrs. Burns had conceded liability, that is, that she had breached a duty of care by entrusting the Jeep to her husband because she knew of her husband's prior drunk driving history. Mrs. Hendrix contends these rulings all were abuses of discretion or erroneous.

1. **Evidence that at the time of the accident Mr. Burns was drunk, was engaged in a "road rage" incident, and then attempted to flee, and that he had prior criminal convictions for drunk driving.**

Soon before an earlier scheduled trial date (which later was postponed), Mr. Burns filed a motion *in limine* to preclude Mrs. Hendrix from introducing evidence that at the time of the collision, Mr. Burns was drunk, was involved in a "road

---

4. There was no evidence that Mr. Burns knew the Camry driver, or his identity, or that they were in an altercation beyond the road rage incident that Mr. Cannon witnessed.

rage" incident, and then attempted to flee, and that he had prior criminal convictions for drunk driving. The judge who then was scheduled to preside over the trial knew that damages would be the only issue for the jury to decide, as summary judgment had been granted on the battery claim and Mr. and Mrs. Burns had conceded liability on the negligence and negligent entrustment claims against them, respectively.[5] Taking the case in that procedural posture, the judge granted the motion *in limine* on the ground that the evidence in question was not relevant to the issue of damages and was inflammatory and unfairly prejudicial in any event. The court made clear, however, that evidence of "how the collision occurred, the fact that [Mr. Burns] went through a red light, and that he may have been driving at an inordinate speed at the time the accident occurred" would be admissible.

The trial date was postponed and the trial later went forward before a different judge. On the rescheduled trial date, Mr. Burns renewed his motion *in limine*. The trial judge agreed with the prior grant of the motion. The judge clarified that it would be

appropriate for [counsel for Mrs. Hendrix] to explore the impact of the accident; whether it was a light impact, a moderate impact or a severe impact. That would be relevant to the issue of damages to Mrs. Hendrix.... But with respect to other conduct, I don't see how it does anything except raise issues that aren't involved with this case right now ... if [counsel for Mrs. Hendrix] wants someone to describe the impact and the manner in which [Mrs. Hendrix] was tossed and turned perhaps in the car or whatever it was, I mean, that's relevant to the injuries and the damages that [Mrs. Hendrix] is alleging, but other than that, I don't see it for any other reason except to inflame the jury because this is a case on damages.

---

5. Later in this same hearing, the judge reconsidered the original grant of summary judgment and reinstated the battery claim. This decision later was overturned by another circuit court judge, who reinstated the grant of summary judgment. The judge's ruling on the motion *in limine* did not change, however.

During the trial, the court precluded Mrs. Hendrix from testifying that, due to her 26 years of experience as a 911 call center operator, she had "a very strong fear of being hit by a drunk driver," and she "suffered immensely" when she learned, after the accident, "that she had been hit by a repeat drunk driver" who then had attempted to flee the scene.

On appeal, Mrs. Hendrix contends she should have been permitted to adduce this later-learned evidence because it contributed to the emotional distress she experienced as a result of the accident, for which she was entitled to seek damages. Mrs. Hendrix maintains that, even though liability was conceded, Mr. Burns's state of inebriation, his involvement in a "road rage" incident, his attempt to flee, and his history of drunk driving were relevant to the issue of her emotional distress, and therefore to damages; and, although that evidence was prejudicial, it was not unfairly prejudicial. Mrs. Hendrix argues, for example, that she should have been allowed to testify about her particular fear of being involved in an accident with a drunk driver, and how she was emotionally affected upon learning, after the accident, that that is what had happened to her.

Mr. Burns responds that the trial court properly excluded evidence of his pre- and post-accident conduct.[6] He maintains that, because liability was conceded, evidence of this conduct was irrelevant to the issue of Mrs. Hendrix's damages and, if relevant, was unfairly prejudicial. He characterizes Mrs. Hendrix's argument that she was entitled to recover emotional distress damages for her "awareness," after the accident, of his pre- and post-accident conduct, as a "guise" and a "clever

---

6. Mr. Burns advances a preliminary argument that this issue was not preserved for review because counsel for Mrs. Hendrix failed to make a sufficient proffer as to Mr. Burns's pre- and post-accident conduct; specifically, whether Mr. Burns had consumed alcohol on the day of the accident or was under the influence of alcohol at the time of the accident. We are satisfied that the trial court had been made aware of the nature of the evidence Mr. Burns sought to exclude. Indeed, Mr. Burns's motion *in limine* itself states: "As set forth in the police report, and as conceded by Mr. Burns at his deposition, Mr. Burns had consumed alcoholic beverages before the accident."

attempt . . . to interject impermissible evidence of [his] bad conduct" into the case. He points out that Mrs. Hendrix, Mr. Hendrix, and Mrs. Hendrix's friends and neighbors were allowed to testify—at times graphically—about Mrs. Hendrix's physical injuries and attendant emotional distress. He argues that his prior conduct constituted "prior bad acts" evidence that only could be admitted for limited purposes, as allowed by Rule 5–404, none of which applied here.

 The threshold issue here is one of relevancy. Evidence is "relevant" if it has "any tendency to make the existence of any fact *that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." Md. Rule 5–401. (Emphasis added.) Evidence that is not relevant is not admissible, and will be excluded when a timely objection is asserted. Md. Rule 5–402; *State v. Simms*, 420 Md. 705, 724, 25 A.3d 144 (2011). When evidence is relevant, however, the court has discretion to exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403; *see also Simms*, 420 Md. at 725, 25 A.3d 144.

 The decision whether to allow or preclude the admission of evidence is generally committed to the sound discretion of the trial court. *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594, 619–20, 17 A.3d 676 (2011). We will only find an abuse of such discretion "where no reasonable person would share the view taken by the trial judge." *Consol. Waste Indus. v. Standard Equip. Co.*, 421 Md. 210, 219, 26 A.3d 352 (2011) (quoting *Brown v. Daniel Realty Co.*, 409 Md. 565, 601, 976 A.2d 300 (2009)). We review for clear error "the trial judge's factual finding that an item of evidence does or does not have 'probative value,'" but we review *de novo* "the trial judge's conclusion of law that the evidence at issue is or is not 'of consequence to the determination of the action.'" *Gasper*,

418 Md. at 620, 17 A.3d 676 (citing *Parker v. State,* 408 Md. 428, 437, 970 A.2d 320 (2009)).

Although the actions sued upon in this case were negligence (against Mr. Burns) and negligent entrustment (against Mrs. Burns), only the damage elements of those claims were before the jury for decision. The other essential elements of the torts—breaches of the standard of care and proximate causation—had been conceded by the Burnses. Accordingly, on those elements, there was nothing for the jurors to decide. The only issue for them to decide was the damages recoverable by Mrs. Burns as a consequence of the accident. So the first relevancy question here is whether the evidence that was excluded had a tendency to make any fact that was of consequence to the determination of the action— here, the issue of damages—more probable or less probable. Because the question is one of law, we decide it *de novo. See Gasper,* 418 Md. at 619–20, 17 A.3d 676.

The fact that Mr. Burns was drunk and in a "road rage" incident at the time of the collision, and attempted to leave the scene after the accident, was not of consequence to the issue of damages. Mrs. Hendrix was permitted to elicit evidence of the speed of the vehicles at the time of the collision and the severity of the impact. Whether the force of the impact would have been less had Mr. Burns not been in a state of inebriation or engaged in a "road rage" incident was of no consequence; the force of the impact was what it was, and, as noted, Mrs. Hendrix was given full rein to put on evidence about that. As such, the excluded evidence had nothing to do with the nature or severity of the physical injuries Mrs. Hendrix sustained in the accident, and hence the compensation she should be awarded for those physical injuries and the emotional distress, *i.e.,* non-economic pain and suffering damages, she suffered as a result of those injuries.

"[I]n tort actions, damages may be recovered for emotional distress capable of objective determination." *Belcher v. T. Rowe Price Found., Inc.,* 329 Md. 709, 734, 621 A.2d 872 (1993). The emotional distress must have been proximate-

ly caused by the defendant's tortious conduct. *Smallwood v. Bradford*, 352 Md. 8, 18–19, 720 A.2d 586 (1998). In the case at bar, substantial evidence was adduced during the four-day trial about the emotional distress that Mrs. Hendrix experienced as a result of the accident. As noted, Mrs. Hendrix herself testified that, as the accident was happening, she thought she was going to die; that she was thinking, ". . . oh, my God! This is not how this is supposed to end" and ". . . am I going to die this way?" Captain Hahn testified that he heard the collision before he arrived at the scene, and that it sounded like a "loud screech, a biker boom" and that because of Mrs. Hendrix's injuries and the condition of her car he and his colleagues had to use the "jaws of death" to extract her from the vehicle. EMT Lay testified that Mrs. Hendrix was "moaning" in pain. Photographs of Mrs. Hendrix's car were admitted that showed the extensive damage to the vehicles, blood on the driver's seat of Mrs. Hendrix's vehicle, and bruises to her body suffered in the accident that took months to heal. Mrs. Hendrix's co-worker, neighbor, and daughter testified about the depression she experienced, and has continued to experience, as a result of the injuries she sustained in the accident. Mrs. Hendrix testified at length about the negative impact the injuries have had on her life, including forcing her to sleep in a recliner for months and not being able to raise her arms, and that she even now experiences "excruciating pain." The jurors were permitted to award Mrs. Hendrix damages for the fright she so vividly described experiencing during the accident and the emotional trauma her physical injuries caused her to endure.

What Mrs. Hendrix argues she was not allowed to recover, because of the court's *in limine* ruling, was emotional distress that she experienced upon learning, after the accident, that the person who struck her was a drunk driver, with a history of drunk driving, who had been in a "road rage" incident at the time of the collision and then tried to flee the scene. In other words, she maintains that she experienced additional emotional distress based upon information she learned, after the accident, about the person who hit her (Mr.

Burns) and the conduct he had been and was engaging in prior to and after the accident; and that she should have been permitted to recover damages for that additional emotional distress. Accordingly, the excluded evidence was relevant to the issue of damages and should have been allowed.

Mrs. Hendrix relies upon four cases to support her argument. First, she quotes as follows from *Beynon v. Montgomery Cablevision Ltd. P'ship*, 351 Md. 460, 718 A.2d 1161 (1998):

> The actor responsible for the wrongful, negligent act is liable for all proximately caused emotional distress experienced by the tort victim. The wrongful conduct need only proximately cause the emotional distress or mental anguish, independent of the physical injuries; the mental disturbance need not result from physical injury.

*Id.* at 507, 718 A.2d 1161. To be sure, this general statement of the law is correct. The *Beynon* case does not support Mrs. Hendrix's position, however. In that case, the issue before the Court was "whether damages for 'pre-impact fright' suffered by a tort victim who dies upon impact are compensable in a survival action." *Id.* at 476, 718 A.2d 1161. The Court held that recovery for " 'pre-impact fright' is permissible when it is the proximate result of a wrongful· act and it produces a physical injury or is manifested in some objective form." *Id.* at 505, 718 A.2d 1161. In the case at bar, Mrs. Hendrix was permitted to recover damages for the fright she experienced as her car was being buffeted about during the accident, including the emotional distress of thinking she was about to die in the accident. There was no issue here as to damages for "pre-impact" fright, however, as the evidence was undisputed that Mrs. Hendrix never saw Mr. Burns's car coming. The *Beynon* case had nothing to do with the issue here, which is whether a plaintiff may recover damages for emotional distress experienced, after an accident, upon learning negative information about the person who caused the accident. Indeed, the issue in the case at bar is the opposite of the pre-impact fright issue in *Beynon,* where the emotional distress, in

the form of fright, was suffered immediately before the impact and had nothing to do with the personal history or circumstances of the person causing the accident.

Mrs. Hendrix relies upon *Smith v. Borello*, 370 Md. 227, 804 A.2d 1151 (2002), as well, which also is unavailing. In that case, a woman was injured in an automobile accident; her injuries included losing her pre-viable fetus. The question before the Court of Appeals was whether, in an automobile tort case brought by the woman against the other driver, the woman could recover damages for the emotional distress she experienced upon losing her fetus. In a footnote, the Court quoted section 456 of the RESTATEMENT (SECOND) OF TORTS for the proposition that "if [an] actor's negligent conduct has so caused any bodily harm to another as to make [the actor] liable for it, the actor is also subject to liability for . . . fright, shock, or other emotional disturbance resulting from the bodily injury or from the conduct which causes it. . . ." *Smith*, 370 Md. at 246 n. 5, 804 A.2d 1151 (quoting RESTATEMENT (SECOND) OF TORTS § 456). The Court noted that comment (e) to section 456 "emphasizes that 'the liability is not limited to emotional disturbance resulting from the bodily harm itself, but includes also such disturbance resulting from the conduct of the actor.'" *Id.* Comment (e) clearly refers to pre-impact fright, however, as, in its entirety, it goes on to illustrate: "Thus one who is struck by a negligently driven automobile and suffers a broken leg may recover not only for his pain, grief, or worry resulting from the broken leg, *but also for his fright at seeing the car about to hit him.*" (Emphasis added.)

*Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993), also cited by Mrs. Hendrix, is readily distinguishable. In that case, the plaintiffs, former patients of a surgeon, learned more than a year after having had their surgeries that the surgeon had been infected with Human Immunodeficiency Virus (HIV), the virus that causes AIDS, when he operated on them. (They learned that information when, after the surgeon's death, the local newspaper reported his cause of death as AIDS). Soon thereafter, the plaintiffs underwent HIV testing, which showed that they were not infected with HIV.

Nevertheless, they sued the estate of the surgeon and the hospital he had worked for, claiming that he had failed to adhere to standards of informed consent by not disclosing his HIV-positive status to his patients before operating on them, and, as a consequence, that they were suffering from a fear of contracting AIDS. The circuit court dismissed the complaints on the ground that they did not allege a compensable injury.

The Court of Appeals reversed, stating that the plaintiffs' initial fear that they had become infected with HIV could have been reasonable, until the time that HIV testing showed that they had not been infected, but their continued fear of contracting AIDS even after they tested HIV-negative more than a year after their possible exposure (meaning the risk of contracting AIDS from their exposure to the HIV-positive surgeon was "extremely unlikely") was unreasonable. *Id.* at 455, 620 A.2d 327. The Court held that the plaintiffs could recover damages for fear of having contracted HIV only if they could show physical manifestations of their fear and only for the period constituting "their reasonable window of anxiety—the period between which they learned of [the surgeon]'s illness and received their HIV-negative results." *Id.* at 455–56, 620 A.2d 327.

There is a superficial similarity between this case and *Faya* in that, in *Faya*, the patients learned after their surgeries that their surgeon had been infected with HIV when he operated on them and, in this case, Mrs. Hendrix learned after the accident that the driver who had collided with her car had been drunk, in a "road rage" incident, had tried to flee, and had a criminal history of drunk driving offenses. In *Faya*, however, the information the patients learned about their surgeon after their surgeries was relevant to their emotional distress—for the period until they tested HIV-positive—because of the possibility that, during their surgeries, the surgeon had infected them with the virus. Thus, their emotional distress for that period was not a consequence merely of learning that the surgeon who treated them had been HIV-positive. The distress was for the reasonable fear that he had infected them with the virus, *i.e.,* that they had suffered a

physical injury as a consequence of the surgeries performed without adequate informed consent. Had they been treated by an HIV-infected doctor who did not touch them and had not been in any position to transmit the virus to them (for example, a psychiatrist), the mere fact that they later learned that their doctor was HIV-positive would not have been the basis for recovery of emotional distress damages. In the case at bar, by contrast, the information Mrs. Hendrix later learned about Mr. Burns was not connected to any injury she suffered in the accident and emotional distress consequential to that injury. It was simply negative information about Mr. Burns that explained why he ran the red light but did not affect in any way the injuries she sustained in the accident or the emotional distress she experienced as a consequence of those injuries.

Mrs. Hendrix also cites *Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979), for the proposition that the defendant's negligent conduct is admissible to prove the plaintiff's emotional injury even though the plaintiff did not learn of the conduct until some time after the fact. In *Vance,* in the midst of divorce proceedings, the defendant told the plaintiff that they were not actually married because, when they had been "married" some 20 years prior, his divorce from his first wife was not finalized. He thought that it had been, but, upon learning about a month later that it had not, he did not inform the plaintiff. The plaintiff learned of this for the first time during the divorce proceedings.

The plaintiff sued the defendant for negligent misrepresentation, seeking to recover damages for emotional distress. She alleged that, upon learning that her marriage had been a nullity and that her children were illegitimate (which she believed but actually was not the case), she had "suffered an emotional collapse and depression which manifested itself in her external condition," *i.e.,* changes in her appearance, symptoms of an ulcer, inability to sleep, and inability to function normally. *See id.* at 501, 408 A.2d 728. The defendant took the position that because there was no physical impact, the plaintiff could not recover damages for emotional distress.

Rejecting that argument, the Court of Appeals held that the plaintiff could recover damages for emotional distress that had manifested itself by physical symptoms and that was proximately caused by the defendant's negligently misrepresenting to the plaintiff that they had been legally married.

In *Vance,* the plaintiff sustained no injury at all until she learned of the defendant's 20–year–old misrepresentation. Furthermore, the defendant's misrepresentation about the status of the parties' marriage was itself the wrongful act that caused the plaintiff's harm. The plaintiff's physical injury arose from the depression and anxiety that resulted from her discovery of the misrepresentation. In the case at bar, Mrs. Hendrix's after-acquired knowledge about Mr. Burns was collateral to the injuries she sustained in the accident. The breach of duty by Mr. Burns in failing to stop for the red light and hitting Mrs. Hendrix's vehicle began and ended when the collision happened. At that point, the damage had been done. It made no legal difference whether Mrs. Hendrix later discovered that the tortfeasor was a repeat drunk driver or Mother Teresa[7]—her damages, including the emotional distress damages attendant to the injuries she suffered in the accident, would be the same.

We agree with the ruling of the trial court that, given the posture of the case—liability for negligence and negligent entrustment admitted and only the issue of damages to be decided by the jury—the fact that, after the accident, Mrs. Hendrix learned that the driver who hit her was drunk, was in a "road rage" incident, attempted to flee after the collision, and had a history of drunk driving convictions did not have a tendency to prove or disprove any fact that was of consequence to the determination of damages, any more than if she had learned, post-accident, that the driver was a pedophile attempting to evade the police or was a desperate husband

---

7. During oral argument in this Court, counsel for Mrs. Hendrix suggested that she would have suffered less emotional distress if she had learned after the accident that the driver who had struck her had been "Mother Teresa" (now Blessed Teresa of Calcutta) rather than a drunk driver.

attempting to get his wife to the hospital in time to deliver their baby. In a negligence action in which damages was the only issue to be decided, the reason why Mr. Burns collided with Mrs. Hendrix, whether despicable or laudable, was not relevant to the emotional distress Mrs. Hendrix experienced as a consequence of the collision. Accordingly, the evidence that was suppressed was not relevant, and was properly kept from the jurors.

The trial court not only ruled that the evidence in question was irrelevant, he also ruled that, if relevant, it was unfairly prejudicial to Mr. Burns, and for that reason as well was not admissible. The trial court did not make a clearly erroneous factual finding or abuse its discretion in so ruling. It was reasonable to conclude that, to the extent that the excluded evidence had any probative value *vis-à-vis* Mrs. Hendrix's damages, it was substantially outweighed by the danger of unfair prejudice. As the Court of Appeals made clear in *Lai v. Sagle:*

> In negligence cases, we consistently have held that evidence of prior acts of alleged negligence [is] substantially prejudicial in nature, and is only admissible for limited purposes, similar in nature to those circumstances recognized in Rule 5–404(b). In no instance, however, is such evidence admissible to prove the negligence alleged in the immediate case.

373 Md. 306, 319–20, 818 A.2d 237 (2003) (citations omitted). *See also Smith v. Hercules Co.,* 204 Md. 379, 385, 104 A.2d 590 (1954) ("Evidence of other accidents, particularly where the circumstances are not identical, have little probative value and are calculated to prejudice the jury."). If evidence of Mr. Burns's conduct before and after the accident with Mrs. Hendrix was not admissible to prove that Mr. Burns was negligent in causing the accident with Mrs. Hendrix—which he admitted he was—then it certainly was not admissible on the sole issue of damages. The only possible effect of such evidence would have been to improperly influence the jury and inflate the damages award.

## 2. Mrs. Burns's Concession of Liability for Negligent Entrustment of Jeep to Mr. Burns and Admissibility of Facts Underlying the Negligent Entrustment Claim.

This issue first was raised by Mrs. Hendrix on the afternoon of the first day of trial, after the jury had been selected and before the judge gave his standard set of opening instructions. In the morning, the motions *in limine* we have discussed above had been granted (really, re-granted) and discussed at length among counsel and the court. Counsel for Mrs. Hendrix approached the court about what he would be permitted to say in opening statement, harkening back to the prior *in limine* ruling. He complained that,

> if we're going to say, okay, we're just going on damages, what am I going to be allowed to say? That's what I need to know because, if I'm going to be precluded from giving my opening on why Mrs. Hendrix is here and how it happened—because see, what the defense wants to do is sterilize the case. They want to keep out every bad fact, including what happened to her in the collision.

The trial judge interrupted to say that he already had ruled on that issue, and had made clear that "it's fair for you to describe the impact and how that relates to the damages ... but the other matters that we also discussed are not going to be brought out." Counsel for Mrs. Hendrix then complained that the jurors would not know "why we're suing Mrs. Burns" and that it would seem "absurd" to them that "there's a person in the courtroom being sued that wasn't in the car. We're not allowed to tell them what the theory of the case is? That is absolutely ridiculous in my view."

Counsel for Mrs. Burns interjected that it would be improper for Mrs. Hendrix to put before the jurors the precise nature of the allegations against Mrs. Burns because Mrs. Burns had conceded that she was negligent and eliciting the evidence of why she had been negligent in entrusting the Jeep to her husband would inform the jurors of the conduct by Mr. Burns that the court already had ruled inadmissible. The court again made clear that that evidence would not come

before the jury, that the jury would be told that the defendants had conceded liability, and that Mrs. Hendrix had leeway to move into evidence all facts concerning what happened to her during the accident and afterward.

After the court gave its standard opening instructions, but before it instructed the jurors that the defendants had conceded liability, there was another colloquy at the bench. Counsel for Mrs. Hendrix again complained that the jury was not going to understand why Mrs. Burns was present as a defendant and "[s]he's going to escape any scrutiny because I'm not going to be allowed to say why I brought the suit. They want to understand that Mr. Burns was driving the car. What are they going to understand?" Counsel for Mrs. Hendrix continued to argue against the ruling the court already had made, saying the court was being unfair to "my side" of the case. Counsel for Mrs. Burns stated,

> I simply reiterate. There's nothing prejudicial about the court's ruling. To the contrary, for this jury to properly reimburse Ms. Hendrix for her injuries and to properly assess her damages, which is the only thing they have to do, they do not need to know all of this additional information because it doesn't bear on her damages.

The judge then stated that he had made his ruling. After counsel for Mrs. Hendrix continued to complain that "it's going to be very mysterious to them [the jurors]," the judge stated, "you can do what you need to do and then we'll deal with it if there's any objection." The judge then instructed the jurors that the defendants had conceded liability, as we have quoted above in our statement of the facts and proceedings.

On appeal, Mrs. Hendrix contends the trial court's ruling precluding her from informing the jury of both her assertion of a negligent entrustment claim against Mrs. Burns and the facts underlying that claim "infringed upon [her] right to a fair, open and public jury trial" as guaranteed by the First and Fourteenth Amendments to the United States Constitution and Articles 23 and 40 of the Maryland Declaration of

Rights; and further violated "her right to recover full, fair and adequate compensation for *all* of her injuries and damages suffered as the result of [the Burnses'] tortious conduct" as guaranteed by Article 19 of the Maryland Declaration of Rights. Mrs. Hendrix also argues she was prejudiced by "probable juror confusion" as to Mrs. Burns's role as a defendant. Although she acknowledges that Mrs. Burns conceded liability for negligent entrustment, she maintains she was "robbed" of her right to present the factual basis for her tort claims against Mrs. Burns.

Mrs. Burns responds that the factual basis for her conceded liability for negligently entrusting her vehicle to Mr. Burns was irrelevant to the sole issue for the jury to decide: Mrs. Hendrix's damages. Mrs. Burns argues that Mrs. Hendrix's objection was "nothing more than another mechanism for [Mrs. Hendrix] to bring the highly inflammatory and unfairly prejudicial elements of [Mr. Burns's] past behavior before the jury." She points out that the trial judge instructed the jury, and counsel for Mrs. Hendrix reminded the jury in his opening statement, that she (Mrs. Burns) was a defendant in the case, and that she had conceded liability. Mrs. Burns maintains that there is no merit to Mrs. Hendrix's argument that the jury was in a "total blackout" as to her role in the case; on the contrary, the jury had all the information it needed to decide what damages Mrs. Hendrix was entitled to receive as a result of the injuries sustained in the automobile accident, which was its only function given that summary judgment had been granted on the battery claim and both defendants had conceded liability on the negligence claims.

 The thrust of Mrs. Hendrix's argument on this issue is that, because the jurors were not told that the tort for which Mrs. Burns had conceded liability was negligence in entrusting the Jeep to Mr. Burns and further were not allowed to hear evidence of the facts underlying that claim, *i.e.,* why it was that Mrs. Burns breached a duty of care by allowing her husband to drive the Jeep, her (Mrs. Hendrix's) constitutional rights to a public jury trial and to a remedy for

her injuries were violated. The three cases Mrs. Hendrix cites to support this argument are inapposite, however. In all of them, either the identity of a party to the case was concealed from the jury altogether or the public was denied access to the proceedings. *See King v. State Farm Mut. Auto. Ins. Co.*, 157 Md.App. 287, 850 A.2d 428 (2004) (holding that, in insured's suit against insurer on underinsured motorist insurance policy, the trial court erred by ruling that the identity of defendant would not be revealed to the jury); *Doe v. Shady Grove Adventist Hosp.*, 89 Md.App. 351, 598 A.2d 507 (1991) (affirming trial court's ruling to allow public access to court records, but reversing its ruling not to allow plaintiff to proceed anonymously when plaintiff was alleging that defendant hospital personnel had unlawfully disclosed plaintiff's AIDS diagnosis to plaintiff's friends and family); *State v. Cottman Transmission Sys., Inc.*, 75 Md.App. 647, 542 A.2d 859 (1988) (vacating a "gag order" that prohibited contact with the press in suit by Attorney General under Consumer Protection Act when defendant's sales fell 35% after Attorney General issued press release announcing complaint).

In this case, Mrs. Burns's identity was made known to the jurors as early as in the opening instructions by the trial judge. In informing the jurors that the defendants had conceded liability, the court stated: "the defendants, Charles Robert Burns and Candice Marie Burns, his wife, have essentially stipulated to liability in this case so this is not an issue that you need to decide. . . ." There was a public trial in which the jurors knew that Mrs. Burns was a defendant, together with her husband, and that they had admitted they were liable to Mrs. Hendrix for the claims against them.

Although couched in terms of the violation of constitutional rights, Mrs. Hendrix's true argument is that the court erred in ruling that the nature of the negligence claim against Mrs. Burns and the specific facts supporting that claim were not relevant given that liability, *i.e.*, breach of duty and proximate cause, was conceded and therefore the sole issue for the jurors to decide was damages. The eyewitnesses

to the collision, including Mrs. Hendrix herself, could describe the basics of how the accident happened—that at an intersection controlled by a traffic light, Mr. Burns drove through a red light and collided with Mrs. Hendrix, who was traveling on the green light—and, therefore, regardless of Mrs. Burns's concession of liability, Mr. Burns's basic breach of duty in running the red light would become known to the jurors. Mrs. Burns, on the other hand, was not personally involved in the accident and therefore her tortious conduct in negligently entrusting the Jeep to her husband would not be evident to the jurors. Mrs. Hendrix takes the position that, without knowledge of the basic claim against Mrs. Burns and the facts underlying that claim—i.e., what Mrs. Burns knew about Mr. Burns's past driving record that made it a breach of duty for her to allow him to drive her Jeep—the jurors would be at a loss as to who she was or why she was involved in the case at all. Therefore, she maintains, those facts were relevant and their relevance was not outweighed by any danger of unfair prejudice to the Burnses.

We disagree and hold that the trial court properly ruled that the negligent entrustment allegation, and the facts supporting it, were not relevant to the issue of damages; would have been unfairly prejudicial if admitted into evidence; and there was no danger of jury confusion without that information and evidence before the jury.

■ Allowing Mrs. Hendrix to inform the jury of the precise nature of her negligence claim against Mrs. Burns or the factual basis for that claim necessarily would have injected Mr. Burns's prior bad acts into the case. Maryland recognizes negligent entrustment, a type of negligence, as formulated by section 390 of the RESTATEMENT (SECOND) OF TORTS:

> One who supplies directly or through a third person a chattel for use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its

use, is subject to liability for physical harm resulting to them.

*Broadwater v. Dorsey*, 344 Md. 548, 554, 688 A.2d 436 (1997) (quoting RESTATEMENT (SECOND) OF TORTS § 390). Therefore, revealing to the jury the nature of the negligence claim against Mrs. Burns and the facts underlying it would have meant revealing that Mrs. Burns entrusted the Jeep to Mr. Burns when she knew or had reason to know that he was likely to drive in a manner that would pose an unreasonable risk of harm to himself or others; and that she knew or had reason to know this because of his history of drunk driving.

Because Mrs. Burns had conceded liability for negligent entrustment, the only possible objective in informing the jury of Mr. Burns's prior drunk driving conduct, which would have formed the basis for the negligent entrustment claim, would have been to place him in a more negative light than the jury would have seen him by his having conceded liability, and thereby improperly influence the jury's verdict. As we have explained, Mr. Burns's pre- and post-accident conduct was not relevant to the sole issue before the jury, which was the amount of Mrs. Hendrix's damages proximately resulting from the car accident; and, if relevant at all, was unfairly prejudicial.

Finally, the court adequately informed the jurors of all they needed to know regarding Mrs. Burns: that she was a defendant in the case, that she was married to Mr. Burns, the driver who had collided with Mrs. Hendrix, and that she had conceded liability. Given that the sole issue in the case was damages, there was no reason to think that the jurors would be confused about Mrs. Burns's presence as a defendant; and indeed the record reflects no such confusion.

### III.

#### *Motion to Strike Amendment to Complaint*

On October 30, 2009, 18 days before the first scheduled trial date, Mrs. Hendrix filed a motion for leave to amend her complaint. She sought to add an allegation in her negli-

gent entrustment count that not only did Mrs. Burns know of her husband's previous history of alcohol abuse but she also knew of his record of uncontrollable anger, criminal conduct, and drug abuse. Mrs. Hendrix also sought to add to that count that

> [Mrs. Burns] intentionally and willfully engaged in a scheme to permit [Mr. Burns] to use and to operate a motor vehicle on public highways when she knew, or should have known, of the extreme danger and risk that [Mr. Burns] posed to other motorists and persons on or using said highways, including [Mrs. Hendrix].

Mrs. Burns opposed the motion for leave to amend, arguing that the amendment was inappropriate so soon before trial, and, more important, that the amendment simply was an attempt to allow the introduction of evidence of "alleged outrageous prior conduct by [Mr. Burns]." As Mrs. Burns had conceded all of the elements of negligent entrustment except damages, the allegation of intentional conduct—which is not an element of negligent entrustment in any event—would serve only to "artificially bolster" Mrs. Hendrix's claim for damages.

On November 17, 2009, the day the case originally was scheduled for trial, the court entertained oral argument on several motions, including Mrs. Hendrix's motion for leave to amend her complaint. It was at that hearing that the court vacated the prior order granting summary judgment in favor of Mr. Burns on the battery count, thus reinstating Mrs. Hendrix's battery claim. The court denied Mrs. Hendrix's motion for leave to amend her complaint. In light of its other rulings, the court postponed the trial and ordered that the case would be bifurcated so that separate juries would decide the issues of liability and damages. Later, another circuit court judge vacated the bifurcation order and the order resurrecting the battery claim, reinstating summary judgment in favor of Mr. Burns on the battery count and ruling that the case would be tried before a single jury.

On August 26, 2010, Mrs. Hendrix filed an amended complaint that made changes only to the negligent entrustment count. The changes were the exact same ones she had sought to make on October 30, 2009. On September 9, 2010, Mrs. Burns moved to strike the amendments to the complaint, making much the same arguments she had advanced in opposition to the prior motion for leave to amend. On the day of trial (September 29, 2010), the court granted Mrs. Burns's motion to strike on the ground that the case was being tried on the issue of damages only and therefore the amendment was superfluous.

 A party may amend a pleading without leave of court "by the date set forth in a scheduling order or, if there is no scheduling order, no later than 30 days before a scheduled trial date." Md. Rule 2–341(a). After those dates, a party may amend a pleading "only with leave of court." Md. Rule 2–341(b). "Amendments shall be freely allowed when justice so permits." Md. Rule 2–341(c). We review for abuse of discretion a court's decision to allow or disallow amendments to pleadings or to grant or deny leave to amend pleadings. *Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 443–44, 795 A.2d 715 (2002).

Here, the amendment at issue was made more than 30 days before the trial date (although barely), and therefore leave of court was not required. The trial court's ruling granting the motion to strike the amendments to the negligent entrustment count of the complaint was not an abuse of discretion, however. Mrs. Burns had conceded liability for negligent entrustment, meaning that, as we have explained, evidence of negligent entrustment was irrelevant to the sole issue remaining in the case—the amount of Mrs. Hendrix's damages—and was therefore inadmissible. Accordingly, there was no reason to allow Mrs. Hendrix to amend her complaint when the amendment could have no effect on her recovery. Furthermore, the amendment Mrs. Hendrix sought was an attempt to interject the issues of Mr. Burns's pre- and post-accident conduct, which, as we also have explained, were properly excluded.

**46**

This is clear given that Mrs. Hendrix was seeking to add extraneous allegations of intentional conduct that were not pertinent to the (conceded) elements of negligent entrustment.[8]

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**8.** After oral argument, Mrs. Hendrix filed a motion for supplemental oral argument. We find no merit in that request and the motion is denied.