REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 2338

September Term, 2012

CONNIE HOLLOWAY-JOHNSON

v.

TIMOTHY EVERETT BEALL

Eyler, Deborah S.,
Woodward,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.*

Opinion by Moylan, J.

Filed: November 25, 2014

*Arthur, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Maryland Rule 8-605.1.

By virtue of an at least partially successful suit on the merits, the appellant is in position to recover $200,000 in damages. The appellant's aspiration, however, is to recover three and a half million dollars in damages. What stands between the already captured bird in the hand and the still elusive second bird in the bush is a statutory damages cap. The dominant issue on this appeal concerns the appellant's effort to dissolve that statutory barrier by persuading us that it has somehow been waived. That effort, however, is undermined by a misdirected focus on the wrong question. The appellant directs our attention to the procedural modality of how a protection may be waived. *May it be deemed to have been waived by a failure timely to assert it?* The very different and overarching issue, however, she totally ignores. Trumping the question of "**HOW** is something waived?" is the superseding question of "**WHO** may waive?" The appellant takes the identity of **WHO** for granted. This she may not do.

### The Present Case

This appeal arises out of a wrongful death suit filed by the appellant, Connie Holloway-Johnson, on her own behalf and as personal representative of the estate of her son, Haines E. Holloway-Lilliston, against the appellee, Timothy Everett Beall, a Baltimore City police officer, in the Circuit Court for Baltimore City.[1] Officer Beall was involved in a July 25, 2010 motor vehicle collision that resulted in Holloway-Lilliston's death. The appellant

---

[1] The appellant also filed suit against the Mayor and City Council of Baltimore City, but she voluntarily dismissed the City from the case before trial. Clea v. City of Baltimore, 312 Md. 662, 668, 541 A.2d 1303 (1988), makes it clear that Baltimore City cannot be liable for the torts of the Baltimore City Police Department.

alleged negligence, gross negligence, battery, and violation of Article 24 of the Maryland Declaration of Rights, and sought compensatory and punitive damages of $20 million. Before bringing suit, the appellant provided timely notice of her claim to the Baltimore City Solicitor and the Maryland State Treasurer.

The case was tried to a jury between July 24, 2012 and August 3, 2012. At the close of the appellant's case-in-chief, the court entered judgment in favor of Off. Beall on the gross negligence, battery, constitutional, and punitive damages claims. The negligence claim was submitted to the jury and the jury returned a verdict in favor of the appellant in the amount of $3,505,000. Judgment was entered on August 8, 2012. On August 20, 2012, Off. Beall moved for a new trial or, in the alternative, to revise the judgment. By order of December 14, 2012, the court granted his motion, ordering "that [Off. Beall] is entitled to a new trial" and, "[a]lternatively," ordering "that the judgment entered in this case is revised by reducing it to $200,000.00 in accordance with the Local Government Tort Claims Act."[2]

## The Contentions

On this appeal, the appellant contends:

---

[2]The LGTCA, of course, does not compel the remittitur. With or without any post-trial motion, the LGTCA's statutory damages cap imposed a limit not on the verdict against Off. Beall per se but only on the extent to which the appellant could seek to execute her award against the Baltimore City Police Department. No one, however, has raised any question about the procedural propriety of the remittitur with respect to Off. Beall per se and it is unnecessary for us to dwell on it. The only question of any concern, no matter how the question was bumbled into, is whether the damages cap limits the financial obligation of the BCPD to $200,000. We are content to let the issue before us go at that.

1) that Off. Beall waived the protections afforded by the Local Government Tort Claims Act ("LGTCA") by failing to raise the issue until after the verdict and judgment were entered; and

2) that the court erred in granting Off. Beall's motions for judgment on her claims for gross negligence, battery, violation of Article 24 of the Maryland Declaration of Rights, and punitive damages.

Off. Beall has noted a cross-appeal and contends:

3) that the court erred by denying his motion for judgment on the negligence claim because he was entitled to statutory immunity as the operator of an emergency vehicle in emergency service.

## A Post-Midnight Chase

On the early morning of July 25, 2010, Off. Beall was on duty, working the midnight patrol shift in the Northern District of Baltimore City in a marked police cruiser. He heard a radio transmission from an off-duty officer reporting a black Mercedes convertible and a motorcycle traveling northbound on the Jones Falls Expressway, I-83, near 25th Street, at speeds of approximately 100 miles per hour. Other officers were able to stop the vehicle, which turned out to be a black Toyota, but could not stop the motorcycle.

Off. Beall entered I-83 North from the Cold Spring Lane interchange and began following a motorcycle driven by Holloway-Lilliston. The motorcycle was traveling 35 m.p.h. in a 50 m.p.h. zone. Not sure whether this was in fact the offending motorcycle, Off. Beall maintained a distance of three car lengths behind and followed it to the Northern

Parkway interchange. At that point, Holloway-Lilliston "popped a wheelie"[3] and accelerated to about 75 m.p.h., continuing northbound on I-83. Off. Beall activated his emergency lights and siren and accelerated to keep pace. Off. Beall followed Holloway-Lilliston onto the inner loop of the Baltimore Beltway, I-695 East, still keeping pace with him at a speed of about 75 m.p.h. They continued through the Charles Street interchange, at which point their speed dropped to 50 m.p.h., which was the posted speed limit in what was, at that time, a construction zone.

According to Off. Beall, he was having trouble receiving radio messages while on I-695. He asserted the existence of radio "dead spots" at certain locations in the Northern District in Baltimore City and in Baltimore County where he was unable to receive or to transmit radio messages. Off. Beall denied receiving a radio order from his shift commander that, "[i]f all they're wanted for is traffic, just come back to the district before your radio dies out." At the York Road interchange, Off. Beall did receive this message from his shift commander:

> Yeah, have the officer disregard and come back, notify the state police of his location, the radio is going to die out soon, if there are repeaters out there, so just come on back.

Off. Beall heard the dispatcher then repeat:

---

[3]This is "a maneuver in which a bicycle, motorcycle, or car has its front wheel or wheels momentarily lifted off the ground." "Wheelie." Dictionary.com Unabridged. Random House, Inc. http://dictionary.reference.com/browse/wheelie (accessed: October 27, 2014).

And per, ah, state police, he'll send someone out, but if it's just traffic, he recommends you not to follow it.

Off. Beall responded, "10-4," and turned off his emergency lights and siren. Off. Beall then telephoned the State Police, using his cell phone, advising that he was "following a ... possibly stolen motorcycle eastbound on 695 ... coming up on York Road." Off. Beall advised that he was at "Dulaney Valley Road South," and then the call was cut off.

Off. Beall followed Holloway-Lilliston onto the exit ramp for Dulaney Valley Road South. Off. Beall was traveling at between 41 and 44 m.p.h., and Holloway-Lilliston was traveling at between 31 and 33 m.p.h. On the exit ramp, Off. Beall's cruiser made contact with Holloway-Lilliston's motorcycle and Holloway-Lilliston was ejected from the motorcycle. He landed on the hood of Off. Beall's cruiser and then rolled off the left side of it, ultimately landing head first on the pavement. Holloway-Lilliston suffered severe injuries and died, likely immediately, upon impact with the pavement.

## A Furiously Contested Moot Question

The first major skirmish on this appeal illustrates how easily a trial can go off the tracks or at least be sidetracked down an immaterial tangent. The parties have flailed away at each other over what Off. Beall did or did not do procedurally. They are both operating, however, within the four corners of their mutual assumption that his actions had a controlling influence on the applicability of the damages cap. Nobody paused to think outside the box. Nobody asked whether Off. Beall's action or inaction actually mattered as

far as the cap was concerned. It did not. The skirmish within the box, however, still rages on appeal.

In a tempestuous Punch and Judy exchange of irrelevancies, the appellant leads off with the argument that Off. Beall waived the protections of the LGTCA, Md. Code, §§ 5-301, et seq., of the Courts & Judicial Proceedings Article ("CJP") – specifically, the $200,000 cap on damages – by failing to raise the issue until after the jury verdict was rendered and judgment was entered. She argues that the LGTCA is an affirmative defense that Off. Beall was required to plead specifically before trial and, having failed to do so, thereby waived.

Off. Beall counters by acknowledging that he did not mention the issue of the LGTCA damages cap until his August 20, 2012 motion for new trial or to revise judgment. He nevertheless maintains that the LGTCA damages cap is not an affirmative defense and that he was not, therefore, required to plead it specifically. He insists that the general denial in his answer was sufficient to preserve the defense. In any event, he further argues, the appellant was on notice that her claims were subject to the LGTCA damages cap long before trial because she notified the City of her claim within six months of the accident as required by another section of the LGTCA, CJP § 5-304.

We find it unnecessary to referee that contest. As we shall explain more fully infra, this spirited exchange of contentions is no more than an immaterial sideshow. With respect to the LGTCA's damages cap, what Off. Beall did or failed to do procedurally does not

matter.  The decision was way beyond his pay grade.

## The Local Government Tort Claims Act

Some context is appropriate.  The LGTCA first became law in 1987.  In <u>Ennis v.</u>

<u>Crenca</u>, 322 Md. 285, 291, 587 A.2d 485 (1991), Judge Eldridge explained its purposes.

> The Local Government Tort Claims Act was passed in response to a perceived
> insurance crisis plaguing counties, municipalities and their employees.  The
> legislative history of the Act reflects the General Assembly's concern for the
> impact of increased law suits on the incentive of public employees and
> officials to do their jobs to the best of their abilities.  See the Department of
> Legislative Reference's file on Senate Bill 237 of the 1987 Session of the
> General Assembly.

The LGTCA provides local government employees an "indirect statutory qualified

immunity" from liability for tortious acts or omissions so long as they are acting within the

scope of their employment.[4]  See <u>Smith v. Danielczyk</u>, 400 Md. 98, 129-30, 928 A.2d 795

---

[4]Although the terms can sometimes be confused, Judge Eldridge in <u>Maryland-National Capital Planning Comm'n v. Kranz</u>, 308 Md. 618, 622, 521 A.2d 729 (1987), very carefully distinguished between sovereign immunity, enjoyed by the State of Maryland and its state agencies, and governmental immunity, enjoyed by local governmental units in tort actions.

> As this Court has often pointed out, the doctrine that <u>the State of
> Maryland and state agencies are generally immune from suits, unless the
> immunity has been waived by the General Assembly</u>, "'is firmly embedded in
> the law of Maryland.'"  On the other hand, <u>counties and municipalities do not
> possess this general immunity.  Instead, counties and municipalities</u> have
> never been given immunity in contract actions, and, <u>in tort actions</u>, they are
> not immune with regard to those matters categorized as "proprietary" but <u>are
> immune with regard to those matters categorized as "governmental."</u>

(Emphasis supplied).

- 7 -

(2007). A plaintiff must sue the allegedly negligent employee directly; the LGTCA does not authorize suit against the local government for its employee's actions. See Nam v. Montgomery County, 127 Md. App. 172, 183-85, 732 A.2d 356 (1999); Williams v. Prince George's County, 112 Md. App. 526, 552-53, 685 A.2d 884 (1996); Khawaga v. City of Rockville, 89 Md. App. 314, 323-26, 598 A.2d 489 (1991). Nevertheless, the plaintiff "may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment," unless the employee is found to have acted with what the statute refers to anachronistically as "actual malice."[5] CJP § 5-

---

[5]The phrase "actual malice," although it earlier made what was a necessary distinction in the 20-year period between 1972 and 1992, would now seem to be an anachronism. In LGTCA tort law today, all malice is actual malice. There isn't any other kind. In Darcars Motors of Silver Spring v. Borzym, 150 Md. App. 18, 28-29, 818 A.2d 1159 (2003), this Court described the 1972-1992 distinction.

The very necessity of modifying the noun "malice" with the adjective "actual" strongly suggests that there is or recently has been a definitional problem in describing the predicate for a punitive damages award. Over the twenty year period from Smith v. Gray Concrete Pipe Co., 267 Md. 149, 297 A.2d 721 (1972) through Owens-Illinois v. Zenobia, 325 Md. 420, 601 A.2d 633 (1992), Maryland was plagued with two different forms of malice that could, under varying circumstances, support a punitive damages award. To distinguish the two, we necessarily resorted to [adjectival] modifiers. The traditional malice that we have described above, which was Maryland's exclusive form of malice prior to 1972 and which is Maryland's exclusive form of malice today, we labeled "actual malice." The other, or "non-actual" malice, emanating from the Smith v. Gray Concrete Pipe Co. case, we called "implied malice."

The notion of "implied malice" as a predicate for a punitive damages award first arose in Smith v. Gray Concrete Pipe Co., in 1972. It suffered widespread criticism. The

(continued...)

- 8 -

302(b) (emphasis supplied).

The LGTCA transfers financial liability for torts within the scope of employment from the employee to the local government. CJP § 5-303(b)(1) ("a local government <u>shall be liable</u> for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government") (emphasis supplied). The local government's liability is capped at "$200,000 per an individual claim and $500,000 per total claims that arise from the same occurrence." CJP § 5-303(a)(1).

If the employee is found to have acted with "actual malice," the plaintiff may enforce a judgment against both the local government (up to the damages cap) and the employee. "Actual malice" is defined in the statute as "ill will or improper motivation." CJP § 5-

---

[5](...continued)
handwriting for its demise was placed on the wall in 1991 by the concurring opinion of Judges Eldridge, Cole, and Chasanow in <u>Schaefer v. Miller</u>, 322 Md. 297, 312-32, 587 A.2d 491. The <u>coup</u> <u>de</u> <u>grace</u> was administered in 1992 by <u>Owens-Illinois v. Zenobia</u>. The story of implied malice's rise and fall was articulately told by Judge Karwacki in <u>Scott v. Jenkins</u>, 345 Md. 21, 29-34, 690 A.2d 1000 in 1997.

The qualifying adjective "actual," therefore, has withered into a vestigial organ that no longer serves any conceivable purpose. Old linguistic habits, however, die hard. As we resignedly noted in <u>Darcars</u>, 150 Md. App. at 30:

> The ghost of "implied malice" is so recently departed, however, that instead of using, as we might, the unadorned noun "malice" to refer to the single standard now in the field, we still feel compelled to distinguish "actual malice" from the memory of that dread something else still lurking in the near shadows.

301(b). The local government remains liable to the plaintiff despite a finding of actual malice, but it "may seek indemnification [from the employee] for any sums it is required to pay under [CJP] § 5-303(b)(1)[.]" CJP § 5-302(b)(ii). See Houghton v. Forrest, 412 Md. 578, 591-92, 989 A.2d 223 (2010). Upon a finding of actual malice, the employee becomes personally liable for "all damages awarded in the action" and the successful plaintiff is free to execute on such judgment against the employee. CJP § 5-302(b)(2). The LGTCA damages cap restricts only the amount a plaintiff may collect from the local government; it has no bearing on the overage the plaintiff may collect from an employee who acted with malice. See Francis v. Johnson, ___ Md. App. ___, ___ A.3d ___, No. 673, September Term, 2013, slip op. at 24 (filed October 6, 2014).

The employee, moreover, is liable for punitive damages, not the local government. CJP § 5-303(c)(1) ("A local government may not be liable for punitive damages."). In certain cases and subject to the damages cap, however, the local government "may indemnify an employee for a judgment for punitive damages entered against the employee." CJP § 5-303(c)(2).

The LGTCA is unusual in terms of the modality the General Assembly employed to provide some limited relief to plaintiffs and to protect local government employees. The Maryland Tort Claims Act ("MTCA"), State Government Article § 12-101 et seq. and CJP § 5-522, by contrast, protects state government employees by granting them direct immunity from suit for acts or omissions committed within the scope of employment without actual

malice. It allows injured persons to sue the State on a vicarious liability theory. See Ford v. Baltimore City Sheriff's Office, 149 Md. App. 107, 119-20, 814 A.2d 127 (2002). By contrast, the LGTCA grants employees immunity from damages, but not from suit. The LGTCA requires plaintiffs to bring claims directly against the employee, not indirectly against the local government. See Board of Educ. of Prince George's County v. Marks-Sloan, 428 Md. 1, 29-31, 50 A.3d 1137 (2012) (comparing MTCA and LGTCA).

Unlike the statutory cap on non-economic damages in personal injury cases, CJP § 11-108, the LGTCA does not require trial courts to reduce the amount of a judgment after a jury verdict has been rendered. Rather, the LGTCA requires a plaintiff to bring suit against an employee directly and to obtain a judgment against him, but then prevents the successful plaintiff from actually collecting on that judgment against the employee. See Smith v. Danielczyk, supra, 400 Md. at 130. The LGTCA specifically provides that "a person may not execute against an employee on a judgment." CJP § 5-302(b) (emphasis supplied). Instead, the plaintiff may recover against the local government. Although the LGTCA limits a plaintiff's recovery against a local government to $200,000 per claim and $500,000 per occurrence, the LGTCA does not require a trial court to actually reduce the judgment in conformance with the cap. The judgment is not even entered against the local government; it remains nominally against the employee.

## Baltimore City Police Department

In terms of both its sovereign immunity and its financial responsibility for the tortious conduct of its employees in the scope of their employment, the status of the Baltimore City Police Department ("BCPD") is very unusual, if not indeed bizarre. Is it a state agency so as to come under the coverage, at least presumably, of the MTCA? The confusingly schizophrenic answer is that the BCPD both is and is not a state agency.

The BCPD is now statutorily designated as a "local government" that is specifically covered by the LGTCA. CJP § 5-301(d)(21). This was not always so. Unlike other county or municipal police departments, the BCPD was over a century and a half ago placed under the control of the State by chap. 7 of the Acts of 1860 and was officially designated as a State agency by chap. 367 of the Acts of 1867. For an understanding of the bizarre pre-Civil War circumstances that provoked this seeming governmental anomaly, see Upshur v. Mayor of Baltimore, 94 Md. 743, 51 A. 953, 958 (1902), and H.H. Walker Lewis, "The Baltimore Police Case of 1860," 26 Md. L. Rev. 215 (1966). And see Mayor & City Council of Baltimore v. Clark, 404 Md. 13, 23-27, 944 A.2d 1122 (2008). As Baltimore Police Department v. Cherkes, 140 Md. App. 282, 303, 780 A.2d 410 (2001), described the effect of Chapter 367 of the Laws of 1867:

> By Chapter 367 of the 1867 Laws of Maryland, the General Assembly made the BCPD a State agency, and designated its officials and officers as State officers. That enactment appears today in section 16-2(a) of the Public Local Laws of Baltimore City, which states, "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland."

See also <u>Clea v. Mayor of Baltimore</u>, 312 Md. 662, 668, 541 A.2d 1303 (1988) ("[T]he Baltimore Police Department is not an agency of the City of Baltimore and has not been for some time.").

Although the BCPD formally remains a "state agency" for certain purposes, <u>Mayor & City Council of Baltimore v. Clark</u>, 404 Md. at 26 ("§ 16-2, which designates the Baltimore Police Department as an agency of the State, remained, and still remains, unchanged."), chap. 369 of the Acts of 1997 amended the LGTCA to make it clear, by CJP § 5-301(d)(21), that for liability purposes the BCPD is nonetheless included as a "local government." <u>Houghton v. Forrest</u>, 183 Md. App. 15, 41-42, 959 A.2d 816 (2008); <u>Baltimore City Police Dep't v. Cherkes</u>, 140 Md. App. at 315. The BCPD is, to be sure, a governmental hybrid. For certain arcane governmental purposes, it has been since 1867 and still is a state agency. For purposes of tort law, however, it has been since 1997 a "local government" and, as such, the tort liability of its employees is governed by the LGTCA.

## Who, If Anyone, May Waive the Damages Cap?

The appellant contends that Off. Beall waived the damages cap. The short answer to the waiver issue is that Off. Beall did not waive the damages cap, indeed could not have waived the damages cap, because it was not his to waive. The LGTCA benefits three different constituencies. First, the entitlement to enforce a judgment against a local government instead of against an employee benefits an injured plaintiff by guaranteeing him a source of funds. The LGTCA was designed to provide a remedy for persons injured by

- 13 -

local government employees, who often have limited resources from which an injured person might collect on a judgment. The LGTCA ensures that injured persons will be compensated for their injuries – up to the damages cap – by requiring local governments to pay judgments entered against their employees and prohibiting local governments from asserting governmental immunity as a defense to that responsibility. See Rios v. Montgomery County, 386 Md. 104, 125-26, 872 A.2d 1 (2005). Far from "restrict[ing] a 'traditional remedy or access to the courts,'" the LGTCA "legislatively permits plaintiffs to enforce judgments obtained from suit against the employee against the local government." Id. at 139.

In standing back and looking at the entire LGTCA in perspective, it is clear, moreover, that it is the plaintiff, and not the defendant employee, who actually invokes the LGTCA in the first place. Invoking the LGTCA is the first step toward a plaintiff's goal of recovering out of local government funds. The self-evident function of the stringent notice requirements is to regulate the plaintiff's invocation of the LGTCA. See Rios v. Montgomery County, 386 Md. at 125-28. When the plaintiff successfully invokes the LGTCA, as the appellant did in this case, the LGTCA is invoked as an indivisible package. It is not invoked on an ad hoc basis, subcontention by subcontention. The LGTCA is CJP §§ 5-301 through 5-304, as a whole. The statutory package unquestionably includes § 5-303, which limits the extent to which the local government is required to assume this extraordinary obligation. It was the appellant who invoked the damages cap, along with the rest of the LGTCA. The statutory

limitation, moreover, was promulgated in absolute terms, not as a contingent or discretionary option.

Second, the "may not execute" provision benefits the employee by absolving him from financial responsibility so long as he was acting within the scope of his employment and without malice. The "may not execute" provision, CJP § 5-302(b), applies no matter the size of the judgment against the employee. In an LGTCA case, whether the judgment be for $10,000 or $10 million, an injured party may not collect so much as one penny from the employee directly, so long as the employee is acting without malice and within the scope of his employment. Although the judgment is nominally against the employee, it is as a practical matter frequently meaningless as applied against the employee. No action is required by the employee to protect himself, except to cooperate in the defense of the action. Even then, such action need consist only of explaining to the court that the judgment is subject to the LGTCA and that the plaintiff may not execute against him.

Third, the damages cap protects the local government itself by placing an upper limit on the extent of its liability. Although the LGTCA generally benefits both injured plaintiffs and defendant-employees, the damages cap specifically self-evidently is not for the benefit of either. Plaintiffs would obviously be better off if no damages cap existed. The damages cap is also not for the benefit of the defendant-employees. It does not help them in the slightest. The LGTCA generally may help them, but the damages cap specifically does not. The defendant-employee is neither helped nor hurt by the damages cap per se. In this case,

the damages cap did not reduce the award against Beall to $200,000. But for the remand for other purposes, the award against Beall could stand at $3,505,000. See Board of Education of Prince George's County v. Marks-Sloan, 428 Md. 1, 31, 50 A.3d 1137 (2012) ("[L]ocal government employees are granted only an immunity from damages under the LGTCA."); Smith v. Danielczyk, 400 Md. at 129-30 (Local government employees "may be sued, and judgments may be entered against them."). The very existence of the damages cap, moreover, does not affect the existence of the employee's tort liability per se. It does not, moreover, affect the course of the trial. It is exclusively a post-trial phenomenon, affecting only the ability of a successful plaintiff to execute on a judgment.

The LGTCA damages cap exists solely for the benefit of the local government – for the protection of the public fisc. It is indisputably, therefore, not the prerogative of the defendant-employee to waive the protection of the local government. It was obviously not the prerogative of Off. Beall to say to the Baltimore City Police Department, "Although you are only required by the Maryland Legislature to stand behind me to the tune of $200,000, I am, by my passive non-assertion, abrogating your protection in that regard and subjecting you instead to an obligation of $3,505,000." Off. Beall quite obviously did not possess the authority to waive a protection enjoyed by the BCPD, to override thereby the decision of the Maryland General Assembly, or to amend the provisions of Chapter 594 of the Acts of 1987.

Because the employee acting within the scope of his employment and without malice is not liable for any part of a judgment, the damages cap is of no concern to him. The

damages cap does not protect the employee. Rather, it protects the local government. In the preamble to the legislation enacting the LGTCA, the General Assembly's first stated purpose was "establishing a limit on the liability of the local governments of the State." See 1987 Md. Laws, chap. 594 (emphasis supplied). The Court of Appeals fully explained the purpose behind the LGTCA in Board of County Commissioners of St. Mary's County v. Marcas, LLC, 415 Md. 676, 686-88, 4 A.3d 946 (2010):

> It is clear that the limitation on liability provision was enacted "for the purpose of limiting the civil liability of local government." S. Judicial Proceedings Comm., Summary of Com. Rep., S.B. 237, pg. 3 (Md.1987). The current "cap" amounts resulted from a compromise reached by a Conference Committee convened when "neither house concurred in the other's proposed amendments to H.B. 253 or S.B. 237[.]" [Housing Authority of Baltimore City v. Bennett, 359 Md. 356, 378, 754 A.2d 367 (2000)]. The legislative history includes the following explanation for the cap:
>
>> The $100,000[6] per occurrence cap has both historic and statutory precedent. Since 1971, Boards of Education that are self-insured have been able to raise immunity for judgments in excess of $100,000. Presently, liability may be limited to $100,000 per occurrence. Further, the State's liability in action for which the State is self-insured is limited to $50,000 per individual and $100,000 per occurrence. These limits are established by regulations issued by the State Treasurer pursuant to amendments to the State Tort Claims Act effective in 1985. Thus, the cap is consistent with existing law. Considering that local governments will be paying judgments in situations where they could have previously avoided liability, the cap is equitable. The cap is necessary so that local governments can predict

---

[6]The original version of the LGTCA proposed a cap of $100,000 per claim and $300,000 per occurrence. This was amended prior to the LGTCA's enactment to reflect the current cap of $200,000 per claim and $500,000 per occurrence. See 1987 Md. Laws, chap. 594.

- 17 -

> exposure for both insurance and budgetary purposes. Since local governments provide vital services, unlimited recovery prudents [sic] the prospect of severely impeding the provision of such services.

Office of the Governor, Governor's Legislative Office, Briefing Paper H.B. 253/S.B. 237, 9-10.

The legislative history also includes the following testimony presented to the Senate Judicial Proceedings Committee by Maureen Lamb, then Vice President of the Maryland Association of Counties, and Chair of that organization's Legislative Committee, as well as a member of the Anne Arundel County Council:

> In the Spring of 1985 the Legislative Committee of the Maryland Association of Counties became aware of the problems that local governments were having in purchasing insurance. ... In analyzing the situation it was soon realized that the problem was greater than merely a down cycle of the insurance market. Insurance companies were not only raising prices, they were abandoning the business of insuring governments.

S. Judicial Proceedings Committee, Testimony of Maureen Lamb (Feb. 25, 1987).

(Emphasis supplied).

Just as the damages cap is not the employee's to assert, neither is it his to waive through non-assertion. Together, the indemnification and damage cap provisions of the LGTCA, CJP §§ 5-303(b)(1), 5-303(a)(1), act as a limited indirect waiver of governmental immunity. The LGTCA requires local governments to pay judgments entered against employees for torts committed within the scope of their employment, up to the cap, and prohibits local governments from raising the defense of sovereign or governmental immunity

to avoid that responsibility. It is settled law that sovereign immunity may be waived only by the legislature, and such waivers are strictly construed. See, e.g., <u>Khawaja v. City of Rockville</u>, 89 Md. App. 314, 325, 598 A.2d 489 (1991). No individual – even one authorized to represent the government in litigation – may enlarge the legislature's waiver of immunity. As the Court stated in <u>Board of Education of Charles County v. Alcrymat Corp. of America</u>, 258 Md. 508, 516, 266 A.2d 349 (1970),

> the law is well established that <u>counsel</u> for the State or one of its agencies <u>may not either by affirmative action or by failure to plead the defense, waive the defense of governmental immunity</u> in the absence of express statutory authorization or by necessary implication from a statute[.]

(Emphasis supplied).

A damages cap is a legislatively imposed limitation on the extent to which governmental immunity may be waived. Just as governmental immunity generally may not be waived except by the General Assembly, a statutory limitation on a waiver of governmental immunity may not itself be waived except by the General Assembly. A damages cap simply establishes that governmental immunity is not being waived above the level of the cap.

There is absolutely nothing that Off. Beall could have done or failed to do to make the BCPD liable for a penny more than that provided by the LGTCA damages cap. In fact, there is nothing the BCPD itself could have done or failed to do to make itself liable for a penny more than the cap. The General Assembly created the cap, and only the General Assembly may alter the cap. Section 5-303(a) provides, in absolute terms, "the liability of a local

government may not exceed $200,000 per an individual claim, and $500,000 per total claims." That is not tentative or discretionary language. For all lesser entities, this legislatively established limit is an immutable fact of life.

In answering the question of "WHO may waive?," the General Assembly, of course, may amend or may totally abrogate the damages cap at any time. What is clear is that Officer Beall did not possess any remote authority, expressly or passively, to waive the cap, no matter what he did or did not do.

### The Evidence In the Light Most Favorable to the Appellant

The appellant also contends that the circuit court should not have granted Off. Beall's motions for judgment on her claims for gross negligence, for battery, for a violation of Article 24 of the Maryland Declaration of Rights, and for punitive damages. She maintains that there was sufficient evidence admitted to support those claims and that they should, therefore, have been submitted to the jury. Where, as a practical matter, victories on these contentions would take the appellant is not for us to inquire into.

The appellant relies on the following evidence of Off. Beall's malicious intent so as to raise his fault beyond the level of mere negligence. When the encounter first began, Off. Beall followed Holloway-Lilliston in his blind spot in order surreptitiously to check his license plate number. Off. Beall testified that, at the very outset of the encounter on I-83, when Holloway-Lilliston "popped a wheelie" and accelerated to 75 m.p.h. in a 50 m.p.h. zone, he accelerated in turn in an attempt to "close the gap." Off. Beall agreed that he

pursued Holloway-Lilliston at speeds up to 25 m.p.h. above the posted speed limit, without exigent circumstances, for eight miles outside his assigned jurisdiction. This itself was in violation of Baltimore City Police Department General Order 11-90, which prohibits high speed pursuits except under exigent circumstances and, in any event, prohibits officers from exceeding the posted speed limit by more than 10 m.p.h. Upon reaching I-695, however, Holloway-Lilliston reduced his speed to one consistent with the posted limit, and Off. Beall reduced his speed accordingly.

In the appellant's view, Off. Beall disobeyed three orders from his superiors to break off the chase and "falsely represent[ed]" to his shift commander "that he had broken off the chase" by responding "10-4" and deactivating his emergency equipment, even while continuing to follow Holloway-Lilliston. At the Dulaney Valley Road South exit ramp, which had a posted speed limit of 30 m.p.h., Holloway-Lilliston slowed to between 31 and 33 m.p.h. Off. Beall observed that Holloway-Lilliston had braked, but Off. Beall himself only slowed to between 41 and 43 m.p.h. In the appellant's view, Off. Beall must have known, given the speed differential, that it was mathematically certain that, at their respective speeds, he and Holloway-Lilliston would inevitably collide.

The appellant also adduced at trial (but, for reasons unknown to us, has not argued on appeal) evidence of Off. Beall's post-collision conduct, as having some possible bearing on his credibility. On cross-examination, Off. Beall testified that, immediately after the crash, he did not attempt to render first aid or perform CPR. At some point, Off. Beall

communicated with an Officer Grishkot and requested that he join him at the crash scene.

This may have been before Off. Beall requested a medic, but he was "not sure" as to the

exact sequence. When Off. Beall did request a medic through the police dispatcher, he said:

> Yeah, can you advise the county I need a medic up here. I found this guy up
> here.

(Emphasis supplied). The dispatcher asked why a medic was needed, and Off. Beall

responded:

> Number one male wrecked his motorcycle.

(Emphasis supplied). Off. Beall's choice of words and what he chose not to say could

certainly raise an eyebrow, and that, of course, is classic grist for the factfinding mill.

Looking at the evidence, as we must, in the light most favorable to the appellant, it

is clear that the appellant met her burden of production with respect to her claims of gross

negligence, battery, and a violation of Article 24 of the Maryland Declaration of Rights.

There was enough evidence as to each for the claims to have been submitted to the jury, and

judgment at the end of the appellant's case-in-chief should not have been entered against the

appellant on those claims. We will look briefly at the proof required to establish each of the

three claims.

## A. Gross Negligence

Gross negligence is a level of neglect more egregious than simple negligence, but

distinguishing between the two is not easy. In Barbre v. Pope, the Court of Appeals

explained:

Issues involving gross negligence are often more troublesome than those involving malice because <u>a fine line exists between allegations of negligence and gross negligence.</u> See <u>State, Use of Abell v. Western Maryland R.R.</u>, 63 Md. 433, 443 (1885) (noting <u>the difficulty of distinguishing between negligence and gross negligence, "if it be capable of definition"</u>).

402 Md. 157, 187, 935 A.2d 699 (2007) (emphasis supplied). This Court recently echoed that sentiment in <u>Rodriguez v. State</u>:

The term "gross negligence" has been described as <u>an amorphous concept, resistant to precise definition.</u>

218 Md. App. 573, 598, 98 A.3d 376 (2014) (emphasis supplied). We explained that, because of the "troublesome" factual problem of trying to differentiate between simple and gross negligence, the issue is usually one for the jury, not the court.

"Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case. <u>It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached."</u> Courts have said that <u>the question of whether a defendant's conduct rises to the level of gross negligence is a question for the trier of fact to decide</u>: "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, <u>it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence."</u>

<u>Id.</u> at 598-99 (citations omitted) (emphasis supplied). See also <u>Liscombe v. Potomac Edison Co.</u>, 303 Md. 619, 635, 495 A.2d 838 (1985).

A legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross. Demarcating the illusive line between simple negligence and gross negligence is frequently far more a matter of persuasion, as a matter of fact, than of production, as a matter of law. In this case, the facts

were not so clear as to permit a conclusion, as a matter of law, that the line had not been crossed. The jury could have found from the evidence that Off. Beall understood that a collision was imminent and failed to take action to avoid it in reckless disregard for Holloway-Lilliston's safety. The court erred in removing that count from the jury's consideration.

## B. Battery

A battery occurs when one intentionally makes a harmful or offensive contact with another without that person's consent. Nelson v. Carroll, 355 Md. 593, 600, 735 A.2d 1096 (1999) (citing Restatement (Second) of Torts § 13 & cmt. d (1965)). See also Saba v. Darling, 320 Md. 45, 49, 575 A.2d 1240 (1990) ("A battery has been defined as a harmful or offensive contact with a person resulting from an act intended to cause the person such contact."). In Hendrix v. Burns, 205 Md. App. 1, 20, 43 A.3d 415, cert. denied, 427 Md. 608 (2012), this Court explained the necessary intent:

> "It is universally understood that some form of intent is required for battery.... It is also clear, however, that the intent required is not a specific intent to cause the type of harm that occurred." Nelson, 355 Md. at 601-02, 735 A.2d 1096 (footnote omitted). The Nelson Court further explained:

>> "The intent element of battery requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact."

> Id. at 602-03, 735 A.2d 1096. See also MPJI-Cv 15:2 (stating, in part, that "battery is the intentional touching of a person without that person's consent"). In addition, lesser states of mind – such as recklessness or wantonness – do

not equate to the intent to cause a harmful or offensive contact. "Reckless, wanton or willful misconduct differs from intentional wrongdoing." <u>Johnson v. Mountaire Farms of Delmarva, Inc.</u>, 305 Md. 246, 253, 503 A.2d 708 (1986).

A battery may be committed by the use of an instrumentality, such as an automobile. See <u>Hendrix</u>, 205 Md. App. at 22 (noting that battery could be committed by use of an automobile and could be proved by application of transferred intent doctrine, but finding no evidence of intent to inflict harm).[7] In this case, offensive and harmful contact between Off. Beall's police cruiser and Holloway-Lilliston was obviously made. The evidence was legally sufficient to permit an inference that the battery was intentional. The claim should have gone to the jury.

## C. Constitutional Tort

The appellant asserted a claim for violation of Article 24 of the Maryland Declaration of Rights, specifically based on "Beall's use of excessive force." She argues in her brief that Off. Beall "intentionally misused his police vehicle" and thereby violated Holloway-Lilliston's "substantive due process right to life." Article 24 provides:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

---

[7]For an exhaustive examination of the multiple crimes as well as the torts constituting a "battery" or "assault and battery," see <u>Lamb v. State</u>, 93 Md. App. 422, 613 A.2d 402 (1992).

- 25 -

It is frequently and informally referred to as the Maryland equivalent of the federal Due Process Clause.

Because analytic recourse in such cases must ultimately be had to the federal Fourth Amendment, the more appropriate bridge thereto would appear to be Article 26, which is routinely referred to as the Maryland equivalent of the Fourth Amendment and is interpreted in pari materia with that amendment. Whether an excessive force claim is brought under Article 24 or Article 26, however, is a distinction without a difference. As Judge Barbera (now Chief Judge of the Court of Appeals) wrote for this Court in Randall v. Peaco:

> [A] claim of excessive force brought under Article 24 is analyzed in the same manner as if the claim were brought under Article 26. In both instances, the claim is assessed under Fourth Amendment jurisprudence, rather than notions of substantive due process, precisely like the analysis employed for claims brought under 42 U.S.C. § 1983.

175 Md. App. 320, 330, 927 A.2d 83, cert. denied, 401 Md. 174 (2007) (citing Okwa v. Harper, 360 Md. 161, 203-04, 757 A.2d 118 (2000)) (emphasis supplied). See also Williams v. Prince George's County, 112 Md. App. 526, 547, 685 A.2d 884 (1996) ("[T]he essential analysis ... is the same under Articles 24 and 26 of the Maryland [Declaration of Rights] as that under the Fourth Amendment of the United States Constitution."); Hines v. French, 157 Md. App. 536, 574-75, 852 A.2d 1047 (2004) ("The standards for analyzing claims of excessive force are the same under Articles 24 and 26 of the Maryland Constitution as under the Fourth Amendment of the United States Constitution.").

In <u>Espina v. Prince George's County</u>, 215 Md. App. 611, 654, 82 A.3d 1240 (2013), <u>cert. granted</u>, 438 Md. 142 (2014), as in the present case, the constitutional claim was brought under Article 24 but not under Article 26. The defendant argued that the Article 24 claim should not have been submitted to the jury. We flatly rejected that argument.

> The County asserts that, as a matter of law, the Espinas' Article 24 claim should not have been submitted to the jury because such a claim can only be asserted via an Article 26 claim. We disagree.
>
> We have explained that <u>claims brought under Article 24 of the Maryland Declaration of Rights are analyzed utilizing the same test as claims brought under Article 26.</u> ...
>
> The County misstates the law on this issue. Simply because an Article 24 claim is analyzed utilizing the Article 26/Fourth Amendment reasonableness standard articulated in <u>Graham</u>, a claimant is not precluded from asserting an Article 24 claim. Rather, an Article 24 claim is viable if a claimant can prove excessive force under the <u>Graham</u> test. ...

215 Md. App. at 653-54 (emphasis supplied).

Whether the claim is made pursuant to Article 24 or Article 26 or both, the ultimate test for excessive force is that which the Supreme Court set forth in <u>Graham v. Connor</u>, where the Court explained why a Fourth Amendment framework of analysis is preferable to a "due process" analysis:

> This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. <u>We hold that such claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard.</u>

... Because the case comes to us from a decision of the Court of Appeals affirming the entry of a directed verdict for respondents, we take the evidence hereafter noted in the light most favorable to petitioner.

490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989) (emphasis supplied).

In assessing the use of arguably excessive force by an officer, the Supreme Court made it clear what the controlling standard is.

Today we make explicit what was implicit in [Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)]'s analysis, and hold that all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

490 U.S. at 395 (emphasis supplied). The Court also made reference to factors that may affect the officer's credibility.

[I]n assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen. See Scott v. United States, 436 U.S. 128, 139, n.13, 98 S. Ct. 1717, 1724, n.13, 56 L. Ed. 2d 168 (1978).

490 U.S. at 399 n.12 (emphasis supplied).

Utilizing the Graham v. Connor test, it is clear that the appellant presented a legally sufficient case of excessive force and that the constitutional tort claim, therefore, should have been submitted to the jury.

- 28 -

Should a jury on retrial, however, find that Off. Beall was liable for a violation of Article 24 of the Maryland Declaration of Rights, we hasten to point out that the LGTCA's damages cap would continue to limit the obligation of the local government (the BCPD) to a total of $200,000 for all of the claims arising out of this single incident.

Although numerous dicta had pointed toward the applicability of the LGTCA damages cap to a constitutional tort, no square holding in that regard had ever been announced until this Court's decision in Espina v. Prince George's County, supra.

> The applicability and constitutionality of the LGTCA damages cap, as applied to constitutional claims, is an issue that has been presented several times but never addressed by this Court or the Court of Appeals. In this case, however, we are presented squarely with the issue of the constitutionality of the LGTCA damages cap and are asked to decide the extent to which the LGTCA limits recovery for state constitutional violations.

215 Md. App. at 628-29 (emphasis supplied).

After an exhaustive analysis of the legal issue, Judge Berger's conclusion for this Court was clear:

> In sum, based upon the statutory language, case law, and legislative history, we see no basis to conclude that the legislature intended that the LGTCA damages cap not apply to claims involving constitutional violations. Accordingly, we hold, as a matter of statutory interpretation, that the LGTCA damages cap applies to the claims in the instant case.

215 Md. App. at 640 (emphasis supplied).

## D.  Punitive Damages

At this stage of our analysis, the appellant's contention about her right to go to the jury on the question of punitive damages answers itself. We have held that she had a right

to go to the jury on her claims of 1) gross negligence, 2) battery, and 3) a violation of the Maryland Declaration of Rights. Of those three, one of them, gross negligence, could not serve as a predicate for a punitive damages award. That is the teaching of Owens-Illinois v. Zenobia, supra, as it held that "implied malice," to wit, gross negligence, would not qualify as a predicate for punitive damages.

The other two claims, on the other hand, could qualify as predicates for punitive damages. They would both, if found to have occurred, be torts committed with malice, that is, intentional torts as contrasted with accidental or negligent torts. Should the jury find one or both "with malice" and should it award compensatory damages for one or both, it would thereby have established a predicate for punitive damages.

Let us take the constitutional tort as an example. The malice implicit in Off. Beall's use of excessive force on the victim would, ipso facto, be enough to permit, although it would not compel, an award for punitive damages. The very finding of the constitutional tort with malice would in and of itself satisfy the burden of production for punitive damages. There is no additional substantial element of the tort that would need to be established.

To be sure, an award of punitive damages requires the satisfaction of a much higher burden of persuasion than does the establishment of the base tort itself, but that higher burden of persuasion does not involve appellate review of the legal sufficiency of the evidence to take the issue to the jury. It involves the burden of persuasion and not the burden of production.

- 30 -

To award punitive damages, a juror must be persuaded to do so by the clear and convincing level of persuasion, whereas to find the underlying tort the juror need only be persuaded by a bare preponderance of the evidence. Which level of persuasion is actually satisfied, however, is for the juror, and not for the reviewing court, to say. The establishment of the underlying tort, moreover, only permits, but indisputably does not compel, an award of punitive damages. As a function of persuasion, the juror must feel that the circumstances of the tort were so egregious or the motivation of the tortfeasor so outrageous as to call for the sterner sanction. Zenobia, 325 Md. at 454, described articulately the purpose of punitive damages.

> "[T]he purposes of punitive damages relate entirely to the nature of the defendant's conduct." ... The availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct.
>
> Awarding punitive damages based upon the heinous nature of the defendant's tortious conduct furthers the historical purposes of punitive damages – punishment and deterrence. Thus, punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability.

(Emphasis supplied). As a matter of persuasion, the juror must feel strongly (clearly and convincingly) the need to punish the tortfeasor or to deter other possible tortfeasors from similar conduct. The recompense of the victim should, as an abstract matter, have nothing to do with it, although it probably will.

Just as three of the appellant's tort claims may now go to the jury, two of them could be the basis for the jury to award punitive damages. Let it never be forgotten, however, that the Local Government Tort Claims Act, CJP § 5-303(c)(1), unequivocally provides:

> (c) *Punitive damages; indemnification*. – (1) A local government may not be liable for punitive damages.

### Is Malice Ever Non-Actual?

The presence or absence of malice, simple or actual, has not been a dispositive factor in this case. It has nonetheless haunted our analysis of the voluminous caselaw on tort claims. What is "actual" malice? Is there indeed some junior varsity level of malice that is less than actual? If not, what possible function is being served by the annoying adjectival qualifier "actual" in the frequently, but not universally, recurring phrase "actual malice"? Is the adjective used only for rhetorical emphasis or does it signify some substantive element of malice above and beyond simple malice? Or is it, as in classical literature, simply a standing epithet? The caselaw is of no help.

As we explained at length in footnote 4, supra, the term "actual malice" entered into Maryland's legal vocabulary and served to make a critical distinction during the 20-year period from Smith v. Gray Concrete Pipe Co. in 1972 until Owens-Illinois v. Zenobia in 1992. It distinguished traditional malice, describing an intentional harmful act, from "implied malice" (gross negligence) as an alternative predicate for punitive damages.

Prior to 1972, the discussions of malice, including Judge Barnes's landmark survey of the caselaw in Duncan v. Koustenis, 260 Md. 98, 271 A.2d 547 (1970), spoke exclusively

- 32 -

of the unadorned noun "malice" without any necessity for a qualifying adjective. It was only in 1972, when it became important to distinguish an intentional tort from a merely accidental or negligent tort (up to and including gross negligence), that "actual malice" was contrasted with "implied malice." The function of the adjectives "actual" and "implied" was to distinguish the two varieties or levels of "malice" then in the punitive damages field.

In the Zenobia case itself, which in 1992 eliminated "gross negligence" or "implied malice" as an alternative predicate for punitive damages, Judge Eldridge, 325 Md. at 460 n.20, commented on the usage of "actual malice."

> We recognize that the term "actual malice" has meant different things in the law, that its popular connotation may not always be the same as its legal meaning, and that its use has been criticized. Nevertheless, we simply use the term in this opinion as a shorthand method of referring to conduct characterized by evil motive, intent to injure, ill will, or fraud. In instructing juries with respect to punitive damages, however, it would be preferable for trial judges not to use the term "actual malice."

(Emphasis supplied). After 1992, the distinction had become meaningless.

In Shoemaker v. Smith, 353 Md. 143, 163-64, 725 A.2d 549 (1999), Judge Wilner explained that the term "actual malice" once had significance as an alternative to "gross negligence" or "implied malice."

> The Court of Special Appeals has long applied that, or some similar, standard of "actual malice" in defining "malice" for purposes of public official immunity under common law or under State and local tort claims laws.

> This, we believe, is the appropriate test – the one that the Legislature intended to be applied. For one thing, the fact that it is an alternative to gross negligence, which also will defeat the qualified immunity, indicates clearly

- 33 -

that <u>the Legislature conceived of malice as something beyond the merely</u> <u>reckless or wanton conduct that would be embodied within gross negligence.</u>

(Emphasis supplied).

In <u>Shoemaker</u>, 353 Md. at 164, Judge Wilner contrasted "actual malice" with gross negligence, as he refers to it as "an alternative to gross negligence" and as "something beyond the merely reckless or wanton conduct that would be embodied within gross negligence." Would not the term "malice" alone, without the adjective "actual," serve to make the same distinction? Would not the concept of an intentional tort make the same distinction?

The definitions in the caselaw of "actual malice" and "malice" (just plain malice), respectively, do not signal any discernible difference. In <u>Zenobia</u>, 325 Md. at 460 n.20, Judge Eldridge said of the term "actual malice":

> Nevertheless, we simply use the term in this opinion as a shorthand method of referring to conduct characterized by evil motive, intent to injure, ill will, or fraud.

See also <u>Shoemaker v. Smith</u>, 353 Md. at 161. That is indistinguishable from <u>Barbre v. Pope</u>, 402 Md. 157, 182, 935 A.2d 699 (2007), as it defines garden variety, Brand-X malice:

> We have consistently defined malice as "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud...'"

They are one and the same. <u>Williams v. Prince George's County</u>, 112 Md. App. 526, 550, 685 A.2d 884 (1996), also defined "malice" as scorchingly as "actual malice" has ever been defined:

Malice has been defined as the performance of an act without legal justification or excuse and <u>with an evil or rancorous motive influenced by hate, the purpose of which is to deliberately and wilfully injure another.</u>

(Emphasis supplied). This is about as bad as a tortious intent can get.

In the caselaw, both "malice" and "actual malice" have produced a Thesaurus load of malignant motivations or states of mind, not one of which has ever been the pivotal criterion on which a decision has turned. <u>Shoemaker v. Smith</u>, 353 Md. at 163, defined actual malice as "characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will, or fraud." Those five qualifying states of mind are separated, it should be noted, by the disjunctive "or," not joined by the conjunction "and." Would not virtually any intentional tort qualify for at least one of those mental states? There is no need to qualify more than once. Other linguistic flourishes speak of "spite," "hatred," and "desire to harm." The Local Government Tort Claims Act, in CJP § 5-301(b), defines "actual malice" as "ill will or improper motivation." That would serve to embrace any intentional tort. Intentionally to do an illegal act is an "improper motivation." In <u>Ellerin v. Fairfax Savings</u>, 337 Md. 216, 228, 652 A.2d 1117 (1995), the Court of Appeals noted with respect to punitive damages:

> [W]ith regard to most types of tort actions, Maryland law has limited the availability of punitive damages to <u>situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing.</u>

(Emphasis supplied). Any intentional tort would qualify as "knowing and deliberate wrongdoing." Although many opinions have distinguished "actual malice" from "implied

- 35 -

malice" (gross negligence), we have not found a single case that ever distinguished "actual malice" from some simpler or lesser form of an intentional tort.

Ellerin v. Fairfax Savings, 337 Md. at 233, makes it clear that the malice that will support an award for punitive damages is the intentional, as opposed to accidental, commission of the wrong.

> When a tort was committed willfully and with knowledge of the wrong, instead of by ignorance, mistake or negligence, this Court very early held that it was committed with the requisite "bad motive" to allow punitive damages. ...
>
> [T]his Court has reaffirmed the principle that punitive damages liability must be based on the defendant's conscious wrongdoing.

(Emphasis supplied).

The unnecessarily qualified phrase "actual malice," however, implies a distinction where one no longer exists and inevitably sends the unwary reader on a hopeless quest to find it. This almost robotic intonation of a now fossilized distinction makes an already difficult corner of the law significantly more difficult. Until some compelling reason for speaking of "actual malice" unexpectedly reveals itself, therefore, we will resolutely avoid the phrase. Until evidence surfaces to the contrary, the unadorned noun "malice" says all that needs to be said.[8]

---

[8]Our discussion of "malice," it must be carefully noted, is in the context of standard tort law. "Malice" is an illusive term that shifts meaning from context to context. It has a completely different set of meanings in the world of homicide law. See, e.g., Evans v. State, 28 Md. App. 640, 689-706, 349 A.2d 300 (1975), aff'd, 278 Md. 197 (1976). Its meaning

(continued...)

We conclude that the phrase "actual malice" is a linguistic fossil, except perhaps in the sui generis world of defamation law. It need never be used except when discussing the historical period of 1972 through 1992 in punitive damages law.

If upon retrial the appellant should prevail not on the charge of mere negligence or even gross negligence but upon the charge of battery with malice and/or the constitutional tort with malice, what implications would follow? The appellant could still proceed to execute her judgment for damages against the BCPD (up to the $200,000 damages cap), for the BCPD would be obligated to stand behind Off. Beall financially (up to the limits of the cap) whether he had acted with or without malice, just so long as he had been acting within the scope of his employment. In Houghton v. Forrest, 183 Md. App. 15, 42-43, 959 A.2d 816 (2008), this Court was very clear in that regard.

> [T]he LGTCA allows plaintiffs to enforce a judgment against the employee's local government employer, <u>regardless of whether the defendant committed an intentional or constitutional tort, with or without malice.</u>

(Emphasis supplied).

For any overage of the award amount over the damages cap, moreover, the appellant could proceed against Off. Beall personally for any tort which he had committed with

---

[8](...continued)
shifts yet again in the context of arson law and yet again when dealing with the malicious destruction of property. In terms of tweaking "malice," defamation law, particularly the defamation of public figures, may be a law unto itself. "Malice" also has a special meaning in the context of malicious prosecution law. The word "malice" is a semantic shapeshifter. Our present discussion lies within the four corners of standard tort law.

malice. For a tort committed unintentionally, to wit, negligently (including gross negligence), on the other hand, the appellant would not be permitted to execute a judgment against Off. Beall. That would be, by definition, a tort committed without malice. The primary effect that a finding of "with malice" would have is that it would permit the BCPD to proceed against Off. Beall for reimbursement for the amount that it had been required to expend on his behalf.

## Off. Beall's Cross-Appeal

Off. Beall has filed a cross-appeal, contending that the court should have granted his motion for judgment on the appellant's negligence claim made before the case was submitted to the jury because he was entitled to immunity as an authorized operator who was "operating the emergency vehicle in the performance of emergency service." Transportation Article ("TA"), § 19-103(b). Off. Beall maintains that, at the time of the collision, he was "[p]ursuing" Holloway-Lilliston, who was "a violator or a suspected violator of the law." TA § 19-103(a)(2)(ii). As such, he claims he was immune from suit for ordinary negligence without malice. CJP § 5-639(b).

The appellant asserts that this contention is not preserved for our review. According to her view of the record, Off. Beall's motion was untimely because it was made the day after the close of all evidence and after counsel had argued a motion for reconsideration of another motion for judgment and Off. Beall failed to object to a lack of jury instruction on the subject. On the merits, the appellant contends that Off. Beall was estopped from arguing

- 38 -

that he was pursuing Holloway-Lilliston at the time of the collision because he consistently maintained throughout the trial that he was not pursuing Holloway-Lilliston at the time of the collision and that he had broken off the pursuit and was returning to his post. The appellant also argues that, having been ordered to break off the pursuit, if Beall was in fact pursuing Holloway-Lilliston at the time of the collision, the pursuit was unauthorized and thus immunity would not be available.

The circuit court's denial of Off. Beall's motion for judgment is properly before us on this appeal. He timely made the motion after the close of all evidence but before the case was submitted to the jury. See Waters v. Whiting, 113 Md. App. 464, 475, 688 A.2d 459, cert. denied, 345 Md. 237 (1997) (plaintiff could not "challenge the jury verdicts on appeal given that she did not move for judgment under Rule 2-519 at the close of all the evidence and prior to submission of the case to the jury") (emphasis supplied). Although Off. Beall did not make the motion immediately at the close of all evidence – indeed, there was some dispute as to when the close of all evidence actually occurred, as apparently the appellant had contemplated calling a rebuttal witness but decided not to do so – he made the motion before the court gave jury instructions, before closing arguments, and, critically, before the case was submitted to the jury for decision. As the major function of a motion for judgment is to determine which issues can or should be submitted to the jury and which can or should be decided by the court, Off. Beall's motion was timely. As he has not argued on appeal that

the court erred in not instructing the jury on emergency vehicle immunity, whether or not he took an exception to the court's instructions is irrelevant.

This particular immunity is governed by two statutes. TA § 19-103(b) provides:

> (b) *Immunity from liability generally.* An operator of an emergency vehicle, who is authorized to operate the emergency vehicle by its owner or lessee while operating the emergency vehicle in the performance of emergency service as defined in subsection (a) of this section shall have the immunity from liability described under § 5-639(b) of the Courts and Judicial Proceedings Article.

CJP § 5-639(b), in turn, provides:

> (b) *Emergency vehicle operators.* (1) An operator of an emergency vehicle, who is authorized to operate the emergency vehicle by its owner or lessee, is immune from suit in the operator's individual capacity for damages resulting from a negligent act or omission while operating the emergency vehicle in the performance of emergency service.
>
> (2) This subsection does not provide immunity from suit to an operator for a malicious act or omission or for gross negligence of the operator.

"Emergency service" can consist of:

> (i) Responding to an emergency call;
>
> (ii) Pursuing a violator or a suspected violator of the law; or
>
> (iii) Responding to, but not while returning from, a fire alarm.

TA § 19-103(a)(2). On this cross-appeal, Off. Beall contends that he was "[p]ursuing a violator or a suspected violator of the law" at the time of the collision with Holloway-Lilliston.

- 40 -

Off. Beall's own testimony unequivocally supports the appellant's position that Off. Beall was not acting in "emergency service" at the time of the collision. Off. Beall acknowledged receiving his shift commander's order to break off the pursuit, when he was at the interchange of I-695 and York Road, by responding, "10-4." He explained that "10-4" means he "acknowledge[d] the dispatcher" and he agreed that it meant that he "intended to obey the order." On questioning by his own counsel, he testified that he then turned off his emergency lights and siren and was taking the Dulaney Valley Road South exit ramp to return to his post.

> Q. Did you receive an order to stop the pursuit at any point in time?
>
> A. Yes.
>
> Q. What did you do in response to receiving that order?
>
> A. <u>I turned off my lights and siren and went to the next available exit.</u>
>
> Q. And where were you planning on going?
>
> A. Just as I said, <u>Dulaney Valley Road southbound</u> was the ramp that I was familiar with to take me down Dulaney Valley Road, which merges at York Road at the Towson Circle, and down to Northern Parkway <u>to go</u> westbound <u>back to my area of responsibility.</u>

(Emphasis supplied). By his own testimony, at the time he collided with Holloway-Lilliston on the exit ramp, he was no longer pursuing Holloway-Lilliston and, thus, was no longer operating his cruiser "in the performance of emergency service." As such, he was not entitled to TA § 19-103 immunity. There was no dispute of fact for the jury to decide on this issue, and the court did not err in denying Off. Beall's motion for judgment.

To be sure, an officer's subjective intent is not dispositive. In <u>Schreyer v. Chaplain</u>, 416 Md. 94, 116, 5 A.3d 1054 (2010), the Court commented on the opposite situation, where the officer insisted that he was pursuing a suspect at the time of an accident.

> [A]n officer's perception of the situation, i.e. whether he or she is in pursuit or not, may help inform the court as whether a pursuit occurred, but is not dispositive and <u>cannot change what is not a pursuit, into one.</u> While how the officer characterizes the situation and his or her intent is properly a part of the inquiry, the true nature of the situation, e.g. chase, stakeout, or investigation, ultimately controls whether it falls squarely within the § 19-103(a)(3)(ii) exceptions.

(Emphasis supplied). In this case, however, the officer steadfastly testified that he broke off the pursuit when his shift commander ordered him to do so and that, at the time of the collision, he was merely returning to his post. Where the officer insists that he was not pursuing a suspect, he cannot at the same time ask the court (or the jury) to find that he was and thereby enjoy the benefit of immunity. Purely as a factual matter, the appellant had enough to take the negligence claim to the jury.

> **JUDGMENT OF LIABILITY ON THE NEGLIGENCE COUNT AFFIRMED; ALL OTHER JUDGMENTS REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**
>
> **COSTS TO BE PAID ONE HALF BY THE APPELLANT AND ONE HALF BY THE APPELLEE.**